**In the matter of Stanley BERG, Debtor.**

**Ronald R. Peterson, Plaintiff,**

**v.**

**Stanley Berg, et al., Defendant.**

**Bankruptcy No. 05 B 58649.
Adversary No. 06 A 01026.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 10, 2008.

Ronald R. Peterson, Esq., Elizabeth A. Kalisz, Esq., Jenner & Block, Chicago, IL, for Plaintiff.

Marc O. Beem, Esq., Roger J. Perlstadt, Esq., Miller Shakman & Beem, LLP, Chicago, IL, for EHome Credit Corp. and Wilshire Credit Corp.

James J. Ayres, Esq., Novoselsky Law Offices, Chicago, IL, for Rothmann/Tucker Trust.

Jeffrey Strange, Esq., Jeffrey Strange & Associates, Wilmette, IL, for Defendant Stanley Berg.

John S. Delnero, Esq., Adam R. Schaeffer, Esq., Bell, Boyd & Lloyd LLC, Chicago, IL, for Michael Frisbie.

Gloria Natoli, Esq., Law Offices of Gloria Natoli, Mt. Prospect, IL, for Bhagvan Patel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

On October 15, 2005, Stanley Berg ("Debtor") filed for relief under chapter 7 of Title 11 of the United States Code § 101 *et seq.* ("Bankruptcy Code").[1] At the time of filing, Debtor and his wife held a recorded fee simple interest in property located at 2205 Kipling Lane, Highland Park, Illinois ("Property"). It is asserted that Debtor's undivided one-half interest in the Property became property of the estate pursuant to 11 U.S.C. § 541(a)(1). Title to the Property was contested by various claims, and clouded by a quitclaim deed ("Quitclaim Deed") allegedly executed by Debtor on April 3, 2005, and recorded in Lake County, Illinois on April 18, 2005.

Plaintiff, Ronald Peterson ("Trustee" or "Plaintiff"), is the duly appointed chapter 7 Trustee for Debtor's bankruptcy estate ("Estate"). Plaintiff–Trustee subsequently filed this ten count adversary complaint against Debtor, his wife, Ingrid Berg, Michael Frisbie, Wilshire Credit Corp.,

---

1. The bankruptcy was filed on October 15, 2005, before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") and, therefore, the pre-amendment Bankruptcy Code applies here.

eHome Credit Corp., Gary Tucker, the Rothmann/Tucker Trust, Leonard Rothmann, and Bhagvan Patel (collectively "Defendants").

In Count I, Plaintiff seeks to avoid, pursuant to 11 U.S.C. § 544(a)(3), a purported consensual lien held by Michael Frisbie ("Frisbie") against the Property, because said lien allegedly does not comply with requirements for mortgages under Illinois law.

In Count II, Plaintiff seeks to avoid, as a post-bankruptcy transfer pursuant to 11 U.S.C. § 549, a mortgage purportedly held by eHome Credit Corp. ("eHome") against the Property. In addition, Plaintiff alleges that the act of perfecting the security interest by recording the mortgage without court permission was a violation of the automatic stay pursuant to 11 U.S.C. § 362(a)(4). Also, Plaintiff seeks to preserve the avoidance for benefit of the Estate under to 11 U.S.C. § 551. Plaintiff now seeks to avoid the Mortgage as an unrecorded lien interest using his "strong-arm" powers under § 544(a)(3).

Wilshire Credit Corp. ("Wilshire") was servicer of the eHome mortgage ("eHome Mortgage"), and did not hold a separate mortgage of its own against the Property. However, in Count III, Plaintiff pleaded that he seeks to avoid, pursuant to § 544(a)(3), a mortgage (if any) purportedly held by Wilshire against the Property. The legal description in the eHome Mortgage (that does exist) describes a parcel of real property in New York and Plaintiff alleges that it was recorded there. Therefore, Plaintiff pleaded that if there was a mortgage on the Property held by Wilshire, it would be an unperfected security interest under Illinois law. As it turns out, there was and is no Wilshire mortgage; as servicer, Wilshire was merely the agent of eHome.

On March 25, 2005, Gary Tucker ("Tucker"), Bhagvan Patel ("Patel") and Leonard Rothmann ("Rothmann") filed a Complaint for Constructive Trust/Quiet Title ("Chancery Case") against Debtor and Michael Frisbie in the Illinois Circuit Court of Cook County, Chancery Division. On the same day, those Plaintiffs recorded a *lis pendens* on the Property. In Count IV, Plaintiff seeks to quiet title to the Property against the claims made in that suit.

In Count V, Plaintiff seeks to avoid, pursuant to § 544(b) and 28 U.S.C. § 3301 *et seq.*, any interest asserted or held by Tucker, Rothmann, Patel or the Rothmann/Tucker Trust ("Trust") as a fraudulent transfer. When the United States is a creditor, it has six years to avoid a fraudulent transfer pursuant to 28 U.S.C. § 3306(b)(1), and the Trustee claims the rights to piggyback on the Government's limitations period pursuant to his "strongarm" powers under 11 U.S.C. § 544(b).

In Count VI, Plaintiff seeks to avoid as a fraudulent transfer under 11 U.S.C. § 548 the Quitclaim Deed that was allegedly executed by Debtor for benefit of the Rothmann/Tucker Trust on or about April 3, 2005. Pursuant to § 548(a)(1), a trustee may avoid any transfer made within one year of the bankruptcy with actual intent to hinder, delay or defraud any creditor, or for which the debtor received less than reasonably equivalent value in exchange for such transfer if the debtor was insolvent at the time of the transfer or became insolvent as a result thereof. The Trustee alleges that the transfer was made with actual intent to hinder, delay or defraud Debtor's creditors, and also that it was made without adequate consideration while Debtor was insolvent.

When an attorney engages in a business transaction with a client a rebuttable presumption of undue influence arises voiding that transaction. In Count VII, Plaintiff

alleges that Tucker had a fiduciary relationship with Debtor as his attorney and breached that duty to Debtor. Plaintiff, therefore, seeks to have the Quitclaim Deed earlier mentioned in Count VI voided as the product of undue influence.

In Count VIII, Plaintiff alleges that Debtor's discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(2) through (5), because Debtor transferred an interest in the Property within one year of filing bankruptcy with the actual intent to hinder, delay or defraud creditors; because Debtor concealed, destroyed, or failed to keep and preserve records from which his financial condition could be ascertained; and because Debtor made false oaths regarding his bankruptcy schedules, and otherwise failed to account for his losses. Debtor defends with arguments that these claims were not sufficiently pleaded, were waived, or that the Trustee has not otherwise carried his burden of proof regarding those objections to discharge.

In Count IX, Plaintiff seeks, pursuant to 11 U.S.C. § 542, to compel Tucker to turnover the Property (where he resides) to the Trustee. In order to compel turnover, the Trustee must establish that the Property is property of the bankruptcy Estate pursuant to 11 U.S.C. § 541(a)(1) as interpreted by the Supreme Court in *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204–09, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). *See Century Hotels v. U.S.*, 952 F.2d 107, 112–13 (5th Cir.1992). Tucker disputes that the Property became property of the Estate. Count IX, therefore, turns on whether Debtor's one-half interest in the Property is found to be property of the Estate against the equitable interests asserted by Count V Defendants, and the resolution of Plaintiff's action to quiet title in Count IV.

Finally, in Count X, Plaintiff seeks permission to sell the Property pursuant to 11 U.S.C. § 363(b). The Trustee alleges that he is authorized, pursuant to § 363(h), to sell both the Estate's one-half interest and the one-half interest of Ingrid Berg ("Mrs. Berg").

After considering the evidence, including stipulated evidence, and arguments presented by the parties, the following Findings of Fact and Conclusions of Law are made and will be entered.

### FINDINGS OF FACT

The parties stipulated to a timeline and outline of facts, which are copied as presented by the parties and integrated here. The evidence presented at trial provided the clarifying detail needed to decide the case. That evidence included admissions by Tucker and Debtor as to wrongful intent, their and Mrs. Berg's poor demeanor on the witness stand and their strange stories and accusations (uncorroborated by documents) as to events in which a twenty-five year professional and personal relationship disintegrated in a spiral of deceit. For those reasons, discussed in detail below, it is found and held that the testimony of Tucker, Debtor and Mrs. Berg was not credible except when it was an admission against interest or was reliably corroborated by documents.

*Stipulated Facts*

I. *The Parties*

1. Stanley Berg is an individual residing in the State of Illinois and, on October 15, 2005 ("Petition Date"), filed a voluntary petition for relief under chapter 7 the Bankruptcy Code.

2. Michael Frisbie is an individual residing in the State of Illinois who claims a security interest in real property commonly known as 2205 Kipling Lane, Highland Park, Illinois 60035.

3. Bhagvan Patel is an individual residing in the State of Illinois and asserts

some type of equitable interest in the Property.

4. Gary Tucker is an individual residing at the Property, was at one time the Debtor's lawyer and asserts some type of equitable interest in the Property.

5. The Rothmann/Tucker Trust is a trust and asserts some type of equitable or legal interest in the Property.

6. The Trustee is the duly appointed, qualified and permanent chapter 7 trustee for the bankruptcy estate of the Debtor.

## II. *The Property*

7. The Debtor listed in his Schedule A real property with an address of 825 Kipling Lane, Highland Park, Illinois. However, there is no such address as 825 Kipling.

8. The legal description of the Property is as follows:

LOT 7 IN BLOCK "D" IN HIGH RIDGE ACRES UNIT 2, BEING A SUBDIVISION IN THE NORTH-WEST QUARTER OF SECTION 21, TOWNSHIP 43 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN LAKE COUNTY ILLINOIS.

PIN: 16–21–105–002–0000

9. On July 28, 2000, the Debtor and Ingrid Berg bought the Property at a judicial sale, the judicial sale deed ("Judicial Deed") was signed on November 10, 2000, and the judicial sale deed was recorded on or about February 28, 2001.

10. A true and accurate copy of the Judicial Deed was admitted as Joint Exhibit ("JX") A.

11. On March 14, 2006, the Trustee filed his *lis pendens* (the "Lis Pendens") in the land records of Lake County.

12. A true and accurate copy of the Lis Pendens was admitted as JX B.

## III. *The Mortgages*

13. The Debtor listed on his Schedule D a secured claim held by Wilshire Mortgage Corp. in the amount of $450,000.00.

14. A mortgage naming Michael Frisbie as mortgagee ("Frisbie Mortgage") was recorded against the Property on March 5, 2001.

15. A true and accurate copy of the Frisbie Mortgage was admitted as JX C.

16. A mortgage in favor of eHome Credit Corp. was recorded against the Property on November 30, 2005.

17. A true and accurate copy of the eHome Mortgage was admitted as JX D.

18. The legal description attached to the eHome Mortgage does not describe the Property. Rather, it describes a property in New York. The address and PIN listed on the face of the eHome Mortgage accurately describes the Property.

## IV. *The Quitclaim Deed*

19. On April 18, 2005, a quitclaim deed was recorded in the land records of Lake County.

20. A true and accurate copy of the Quitclaim Deed was admitted as JX E.

### *Additional Evidence Derived at Trial*

21. Tucker was admitted as an attorney by the State of Illinois Supreme Court in 1971. At the time of trial in this matter, he was suspended from the practice of law in Illinois. (Tucker Trial Test.)

22. Tucker has resided continuously at the Property at 2205 Kipling Lane,

Highland Park, Illinois since 1977.(*Id.*)

23. Tucker became Debtor's attorney in 1979, and maintained a professional and social relationship with Debtor until April 2005. Tucker also represented Mrs. Berg in various matters throughout this period. (*Id.*)

24. It was not the custom of Tucker to use an engagement letter in his representation of Debtor, (Debtor Trial Test.), and Tucker and Debtor informally agreed to various fee arrangements—hourly, fixed or contingent—depending on the nature of the transaction and legal work involved.

25. Sometime in the late–1980s, the Bergs' residence was destroyed by fire. Debtor was suspected of setting the fire, and was indicted and tried for arson in Lake County, Illinois. Tucker successfully defended Debtor against those criminal charges.

26. Nevertheless, the underwriter of the Bergs' homeowners' insurance policy, The Hanover Insurance Company and Massachusetts Bay Insurance Company (collectively "Hanover/MBI"), refused to pay under the policy because of Debtor's suspected involvement in the fire.

27. Therefore, on April 6, 1990, Tucker filed a civil lawsuit in the District Court for the Northern District of Illinois on behalf of the Bergs against Hanover/MBI and other defendants, seeking to recover under the insurance contract. (*See* Tucker Exhibit ("Ex.") 1.)

28. Tucker claims that he took on this representation on a contingent fee basis, but no written fee arrangement was initially executed. (Tucker Trial Test.) In addition, sometime in 1995, the Bergs advanced $200,000 to Tucker to cover expenses associated with the lawsuit. (*Id.*)

29. An approximately four-week jury trial was held in April and May 1997, after which the jury returned a verdict in favor of Debtor in the amount of $28,738 and in favor of Mrs. Berg in the amount of $1,161,100. (*See* Tucker Ex 1.)

30. On June 11, 1997, Tucker pled guilty to federal tax offenses. (Tucker Trial Test.)

31. As a result of his pleading guilty to these charges, the Internal Revenue Service ("IRS") recorded tax liens for back taxes of approximately $400,884.52 against the Property. (Trustee Ex. 4.)

32. On June 15, 1997, Debtor executed a one-third Contingent Fee Agreement in favor of Tucker in connection with Tucker's legal services in the Hanover/MBI insurance litigation. (*See* Tucker Ex. 2.) Their agreement was reduced to writing at this time, because Hanover/MBI required it as evidence of a valid attorneys lien against the jury award in order to make Tucker a payee on the check. (Tucker Trial Test.) Mrs. Berg did not sign the Contingent Fee Agreement.

33. The Bergs sought and were granted a new trial on September 30, 1997, on the issue of damages only. (*See* Tucker Ex. 1.)

34. Tucker was convicted of obstruction of justice in the Circuit Court of Lake County (19th Judicial Circuit) case No. 95–F–2597 for obstruction of justice for fabricating an affidavit in a criminal drug case.

35. In October 1997, Tucker was convicted of willful failure to file tax returns in the Northern District of Illinois case No. 97–CR–00239 (the "Tax

Case") and sentenced to prison at Oxford, Wisconsin.

36. On December 12, 1997, Tucker withdrew from his representation of the Bergs, because he was about to be suspended from the practice of law. (Tucker Trial Test.) Tucker was subsequently suspended from the practice of law between January 1998 and June 2000 as a result of pleading guilty in the Tax Case. (*Id.*)

37. Alan Jacobus ("Jacobus"), an attorney affiliated with Tucker, assumed representation of the Bergs in the Hanover/MBI insurance litigation. (*Id.*) Sometime in September 1999, Jacobus affected a settlement in the amount of $1,903,860 for both of the Bergs. The settlement was not apportioned between Debtor and Mrs. Berg, and was deposited in their joint bank account. (Mrs. Berg Trial Test.) Jacobus deducted a fee for his work, but nothing was paid to Tucker.

38. Tucker testified that he and Debtor also met in September 1999 (while Tucker was still under suspension), in order to renegotiate their fee agreement in the Hanover/MBI insurance litigation. (Tucker Trial Test.) According to Tucker, Debtor agreed to convert the case from a one-third contingent fee agreement to a fixed fee of $620,000. (*Id.*) There is no writing memorializing this alleged agreement. (*Id.*)

39. Debtor denied that he ever agreed to the $620,000 figure, and testified that, based on their friendship, he and Tucker agreed not to pursue the matter at that time. (Debtor Trial Test.)

40. Tucker's testimony explaining how he calculated and documented the alleged $620,000 fee is not credible.

 a. According to Tucker, he kept track of his billable hours throughout the litigation for internal purposes so that he could determine the "break-even" point, and that this $620,000 figure represents the time and services he spent on the Hanover/MBI matter. (Tucker Trial Test.) However, no records of hours worked were supplied in evidence.

 b. Tucker presented the testimony of two legal secretaries, who worked for him throughout the Hanover/MBI litigation, and whose responsibilities included preparing bills. They testified that they prepared these bills from handwritten time slips provided by Tucker. However, Tucker was unable to produce these time slips in connection with this Adversary in order to verify his work. When Tucker was suspended from the practice of law, he shipped all his files to Debtor's business, Berg Manufacturing & Sales Corporation ("Berg Manufacturing" or "BMSC"), for storage. Tucker neglected to retrieve those files when BMSC executed a Notice of Assignment for the Benefit of Creditors on April 20, 2005, and they were never recovered.

 c. The first bill purporting to show the $620,000 fee is a one-page document dated January 5, 1998. (*See* Tucker Ex. 4.) That date was approximately twenty-one months before Tucker and Debtor allegedly renegotiated the fee agreement. Tucker tried to explain this obvious anomaly by suggesting that this bill was sent to Debtor for "informational purposes" only. (Tucker Trial Test.)

 d. However, it is impossible to determine what information Debtor was supposed to garner from this so-called "bill". It does not list Tucker's hourly rate or number of hours

worked, let alone a detailed description of the legal work supposedly done; it simply lists a balance due of $620,000.

e. Tucker tried to explain this away by suggesting that his office had been sending detailed bills to Debtor, but did not see the point in sending voluminous bills when he was not billing for new legal work subsequent to his suspension. (Tucker Trial Test.)

f. As a condition of his release from prison, Tucker was required to find employment, and he was hired as an informal advisor to BMSC for which he received a stipend, leased vehicle and corporate American Express credit card. (*Id.*) The purported bills reflect certain credits for these amounts, as well as a $375,000 credit allegedly used towards the purchase of the Property at the judicial sale and also to pay real estate taxes on the Property. (See Tucker Ex. 4.) The bills do not reflect any credit for litigation expenses although Tucker acknowledged that the Bergs were entitled to a credit of $157,000 for monies not used out of the $200,000 advance. (Tucker Trial Test.)

41. In September 1999, Citigroup FSB instituted foreclosure proceedings in the Circuit Court of Lake County, Illinois against the Property.

42. The Rothmann/Tucker Trust was created on January 17, 2000. (*See* Trustee Ex. 21.) Tucker is the grantor of the Trust, Rothmann is the trustee, and Tucker's children are the beneficiaries. The purported *res* of the Trust is the Property. Under terms of the Trust, Rothmann, as trustee of the Trust, is not obligated to distribute the balance of the Trust to the beneficiaries of the Trust until the youngest of the Trust's beneficiaries reaches forty years of age, which will occur sometime in 2029. Tucker maintains that he is entitled to live in the Property rent free until that time.

43. Tucker believed that he could cleanse the Property of the IRS tax liens by letting it go into foreclosure. (Tucker Trial Test.) According to Tucker, he approached Debtor with a plan whereby Debtor would purchase the Property at the foreclosure sale as an accommodation party on behalf of Tucker. (*Id.*)

44. Tucker acknowledged that he executed a release of his attorneys lien so that Jacobus could distribute all of the net settlement proceeds to the Bergs. (*Id.*) Tucker explained that he executed the release of lien because, as a result of his suspension, he could not receive his attorneys fees without petitioning the Illinois Supreme Court under Rule 764.(*Id.*) Despite executing this release of lien, Tucker believed that he retained a claim for attorneys fees earned in the Hanover/MBI insurance litigation. (*Id.*) According to Tucker, Debtor was to use Tucker's attorneys fees to help pay the purchase price at the foreclosure sale. (*Id.*)

45. According to Tucker, Debtor orally agreed to reconvey the Property to Tucker at some unspecified future date. (*Id.*)

46. According to Debtor, he never agreed to act as an accommodation party for Tucker. (Debtor Trial Test.) Debtor testified that he wanted to help Tucker, and was willing to purchase the Property at the foreclosure sale as an investment. (*Id.*) He denied that there was ever an agreement to reconvey the Property, but testified that he was willing to sell it back to

Tucker for cost plus a reasonable profit. (*Id.*)

47. Sometime prior to the foreclosure sale, Debtor informed Tucker that he did not have sufficient funds available to purchase the Property at which point Tucker approached Rothmann and Patel, (Tucker Trial Test.), and obtained the following funds:

a. A bank check dated July 26, 2000, for $50,000 from Rothmann payable to Gary Tucker. (Tucker Ex. 10).

b. Patel, who was also a client of Tucker at one time, provided a total of $158,182.97 toward the purchase of the Property, in the form of:

i. A cashier's check dated July 26, 2000, for $130,000 from Harris Bank payable to McBride, Barker [sic], Coles as Escrowee, (Tucker Ex. 8); and

ii. A cashier's check dated July 31, 2000, for $28,182.97 from Bank One payable to Stanley Berg. (Tucker Ex. 9.)

48. Tucker and Debtor attended the foreclosure sale on July 28, 2000, where Debtor submitted the winning bid of $581,000. (Tucker Trial Test.)

49. Nathan Brenner, an attorney who shared office space with Tucker at various times starting in the late–1970s, attended the foreclosure sale. (Brenner Trial Test.) Tucker requested that Brenner act as attorney for Tucker and Berg. (*Id.*)

50. Brenner testified that at the auction Debtor said that: "[Debtor] was bidding at [Tucker's] request because it was [Tucker's] house, [Tucker] was living there, and that [Debtor] didn't have anything to do with how much the bid would be." (*Id.*)

51. On cross-examination, Brenner conceded that this dual representation probably constituted a conflict of interest. (*Id.*) He never obtained a written consent to this conflict. (*Id.*)

52. The judicial sale deed was not issued until November 10, 2000, and was recorded with the Lake County Recorder of Deeds on February 28, 2001. (JX A.) The judicial deed conveyed the Property to the Bergs as tenants by the entirety. However, the Property was never lived in by the Bergs and was never their homestead. (Debtor Trial Test.)

53. Tucker continued to reside at the Property following the foreclosure sale up until and including the trial in this matter. (Tucker Trial Test.) Tucker did not pay any rent to the Bergs during this time. (*Id.*)

54. Subsequent to acquiring the Property, Debtor borrowed money secured by various mortgages against the Property that are described below.

55. On January 26, 2001, the Bergs executed a mortgage against the Property in favor of American Enterprise Bank ("AEB"). The AEB Mortgage secured a $450,000 home loan executed on the same date. The AEB Mortgage was recorded on February 28, 2001.

56. Frisbie was a business advisor to the Bergs' family business, BMSC, through the Assignment for Benefit of Creditors in April 2005.

57. On February 22, 2001, the Bergs executed a mortgage against the Property in favor of Frisbie. (JX C.) The Frisbie Mortgage was recorded on March 5, 2001.

58. The Mortgage allegedly secures two notes dated August 23, 1998, and July 28, 2000.(*Id.*) The Mortgage does not list the principal debt, interest rate or maturity, or otherwise describe terms

of the loans referred to in the notes. (*Id.*)

59. A demand note executed by Debtor on July 28, 2000, for $100,000 at fifteen percent (15%) interest ("July 28th Note"), payable to Frisbie was entered into evidence. (Frisbie Ex. 1.) The Note does not indicate that it was to be secured by the Frisbie Mortgage. (*Id.*) Frisbie testified that this loan was made in connection with Debtor's acquisition of the Property. (Frisbie Trial Test.)

60. At trial, Frisbie testified that there is no August 23, 1998, note. Instead, he testified that the Mortgage was intended to secure a demand note executed by Debtor on July 23, 1998, for $250,000 at fifteen percent (15%) interest ("July 23rd Note"). (*Id.*) The Note does not indicate that it was to be secured by the Frisbie Mortgage. Furthermore, the original Note was altered on its face after being executed to change its date to August 23, 1998, so as to re-date it in conformance with the Mortgage reference to a note of that date. Frisbie testified that he has no knowledge about how the Note came to be altered. (*Id.*) Nevertheless, based on the discrepancy, he withdrew his secured claim for $250,000 on the record in open court.

61. On July 16, 2004, the Bergs executed a mortgage against the Property in favor of eHome. The eHome Mortgage secured a $470,000 loan refinancing the AEB Note and Mortgage. The proceeds of the eHome loan were used to payoff the AEB loan, and on November 17, 2004, AEB executed a satisfaction of lien that was recorded on December 7, 2004. (eHome Ex. 15.)

62. However, the eHome Mortgage was not recorded until November 30, 2005, approximately six weeks after Debtor filed his bankruptcy petition.

63. By 2005, Berg Manufacturing was insolvent; its cash flow was insufficient to pay debts as they became due. (Frisbie Trial Test.)

64. Debtor's son had taken over BMSC, and by 2005 Debtor was no longer a shareholder, remaining just an employee of the company. However, Debtor had guaranteed some of BMSC's debt to Frisbie and Crestmark Bank, (Debtor Trial Test.), and therefore, participated in the decision to execute an Assignment for the Benefit of Creditors on April 30, 2005. (Tucker Ex. 52.)

65. Sometime in late–2004, Tucker searched the title to the Property and discovered that the Bergs had placed mortgage liens on the property, at which point Tucker demanded that Debtor reconvey the Property to him. (Tucker Trial Test.) Prior to this time, Tucker did not take any steps to see that the Property, the purported *res* of the Rothmann/Tucker Trust, was put into the Trust. (*Id.*) Tucker testified that he never reached a resolution with the IRS, and he continued to want to protect the Property as a Trust asset for his children. (*Id.*)

66. Debtor discussed his financial difficulties with Tucker between January and April 2005. (Debtor Trial Test.) At that time Debtor's liabilities exceeded his cash flow, and his ability to meet those liabilities was contingent upon the value realized from the liquidation of fixed assets. (*Id.*)

67. In March 2005, Tucker met with Debtor and threatened to sue him if he did not convey the Property to Tucker. (Tucker Trial Test.) Tucker drafted a complaint against Debtor to quiet title, which he reviewed with

Debtor at this meeting. (Plaintiff Ex. 13.) Debtor continued to refuse to convey the Property, and on March 25, 2005, Tucker filed the complaint in the Chancery Division of the Circuit Court of Cook County, Illinois. (*Id.*)

68. On April 3, 2005, Tucker came to the Bergs' home with a notary public demanding that the Bergs execute a quitclaim deed to the Property. The Quitclaim Deed purported to convey the property to the Leonard Rothmann/Gary Tucker Trust. (JX E.)

69. Tucker called the notary public as a witness, and she testified that she heard Debtor say that he knew the Property belonged to Tucker. (Denzinger Trial Test.) She described the conversation as somewhat heated. (*Id.*) Debtor eventually signed the Quitclaim Deed at the meeting. (*Id.*)

70. Berg was recalled on rebuttal, and testified that he never said the Property belonged to Tucker. (Debtor Trial Test.)

71. Tucker also tried to get Mrs. Berg to sign the Quitclaim Deed. (Denzinger Trial Test.) According to the notary public, Mrs. Berg said that she did not understand why she did not own the Property since she was making payments on the Property. (*Id.*)

72. Mrs. Berg never signed the Quitclaim Deed. She sought independent advice, and was told that signing the Quitclaim Deed might be a fraudulent transfer. (Mrs. Berg Trial Test.) On the evening of April 3, 2005, Debtor called the notary public, and asked her to void his signature and return the Quitclaim Deed. (Denzinger Trial Test.) The notary told Debtor that she did not think that she had authority to return the Quitclaim Deed. (*Id.*)

73. Debtor testified that he believed that Tucker was acting as his attorney when he executed the Quitclaim Deed. (Debtor Trial Test.) Debtor testified that conveying the Property to Tucker through that deed was believed by him to be a way of protecting his assets from his own creditors in bankruptcy. (*Id.*) Debtor's bankruptcy case was filed on October 15, 2005.

74. Tucker never advised Debtor to obtain independent legal advice before executing the Quitclaim Deed.

75. Mrs. Berg testified that she also believed Tucker was the Bergs' attorney when he tried to get her to sign the Quitclaim Deed on April 3, 2005.

76. The Real Estate Transfer Tax Declaration listed the consideration for the transfer as zero dollars ($0.00). (Plaintiff Ex. 5.)

77. Tucker Recorded The Quitclaim Deed On April 18, 2005. (JX E.)

78. Additional statements of fact contained in the Conclusions of Law section shall constitute additional Findings of Fact.

### *JURISDICTION*

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This Adversary and the various actions thereunder constitute core proceedings under 28 U.S.C. §§ 157(b)(2)(A), (H), (I), (K), (N), (O).

### *CONCLUSIONS OF LAW*

This case arises from a series of unfortunate events attributable partially to venality and partially to the informality and

carelessness with which the parties conducted their personal and financial affairs. At the heart of the matter is Tucker, an attorney who arranged for his client, the Debtor, to purchase Tucker's home at a foreclosure sale. Tucker says this was intended to avoid taxes owed by him to the Internal Revenue Service. Tucker claims that by Debtor's oral agreement, and because Debtor owed him a fee for legal services, he retained an ownership interest in the Property after that foreclosure sale, and that the later transfer of the Property back to him by quitclaim deed signed by Debtor (but not his wife) was the agreed conclusion of that agreement and Tucker's tax avoidance scheme. Debtor, on the other hand, contends that he purchased the Property at the foreclosure sale for himself and his wife, and later transferred the Property to Tucker on advice of Tucker acting as Debtor's attorney, in order to protect his assets from his creditors as his financial problems were becoming critical. Berg effectively admits thereby that he sought to defraud his creditors in this bankruptcy which was soon to be filed. Also involved as players in the drama are various lenders who advanced funds generously but not carefully.

The Property is located in Lake County, Illinois, and the parties agree that Illinois law governs the non-bankruptcy issues.

It is clear that this court lacks jurisdiction to determine the validity of the Frisbie or eHome Mortgages unless the Property is property of the Estate. Therefore, the claims in Counts IV through VII regarding the alleged interests of Tucker, Patel, Rothmann and the Trust must be decided as a threshold matter. Discussion that follows as to those Counts establishes that Debtor's undivided one-half interest in the Property is indeed property of the Estate, and that Tucker must turn physical possession of the Property over to the Trustee pursuant to the allegations in Count IX. Counts I through III, VIII and X are then discussed and decided in favor of Plaintiff. However, the various claims that are decided in favor of Trustee are not decided at all as to Mrs. Berg's half interest over which no jurisdiction lies here.

## COUNTS IV THROUGH VII: DEBTOR'S INTEREST IN THE PROPERTY IS PROPERTY OF THE ESTATE

### Count VII: Tucker's Breach of Fiduciary Duty Voids the Quitclaim Deed

The discussion starts out of order so as to determine the relationship between Tucker and Debtor, which is at the core of events and transactions involved here.

 Plaintiff alleges that Tucker owed Debtor a fiduciary duty, which creates a rebuttable presumption of undue influence and, therefore, Tucker's business transactions with Debtor should be declared void. To recover for breach of a fiduciary duty, a plaintiff must prove that a fiduciary duty exists, that the fiduciary duty was breached, and that the breach proximately caused the injury of which the plaintiff complains. *Crichton v. Golden Rule Ins. Co.*, 358 Ill.App.3d 1137, 295 Ill.Dec. 393, 832 N.E.2d 843, 854 (2005) (citing *Prime Leasing, Inc. v. Kendig*, 332 Ill.App.3d 300, 265 Ill.Dec. 722, 773 N.E.2d 84, 96 (2002)). As an attorney, Tucker owed his client, the Debtor, a fiduciary duty as a matter of law. *See McFail v. Braden*, 19 Ill.2d 108, 166 N.E.2d 46, 51 (1960). Tucker responds that he did not owe Debtor a fiduciary duty, because he did not represent Debtor at the time of the foreclosure sale in July 2000, or when the Quitclaim Deed was executed on April 3, 2005.

In addition, Tucker responds that it was in fact Debtor, who owed him a fiduciary duty, by virtue of possessing money purportedly earned by Tucker as legal fees. The essence of a fiduciary relationship is that one party is dominated by the other. *Pommier v. Peoples Bank Marycrest*, 967 F.2d 1115, 1119 (7th Cir. 1992) (citing *Paskas v. Illini Fed. Savs. & Loan*, 109 Ill.App.3d 24, 64 Ill.Dec. 642, 440 N.E.2d 194, 198 (1982)). A debtor-creditor relationship is not a fiduciary relationship as a matter of law. *Id.* (citing *Paskas*, 64 Ill.Dec. 642, 440 N.E.2d at 199; *Santa Claus Indus. v. First Nat'l Bank*, 216 Ill.App.3d 231, 159 Ill.Dec. 657, 576 N.E.2d 326, 330 (1991)). Tucker testified that he trusted Debtor, but that trust arose from their long attorney-client relationship, which included a personal friendship, and not any special confidence that Tucker placed in Debtor. Tucker has not shown by clear and convincing evidence that Debtor occupied a dominant position in their relationship and, therefore, Debtor did not owe him a fiduciary duty.

Rather, it is found and held that Tucker owed Debtor a fiduciary duty as his attorney. Tucker has not established that he owned the funds used to purchase the Property. See discussion of alleged Resulting Trust in Count V below. Therefore, both the scheme for Debtor to purchase the Property at foreclosure sale and execution of the Quitclaim Deed were business transactions intended to benefit Tucker. Indeed, his testimony made clear that he was thereby trying to avoid IRS lien claims on his home being foreclosed. When an attorney engages in a transaction with a client in an attempt to benefit from that transaction, a presumption arises that the transaction proceeded from undue influence. *See McFail v. Braden*, 19 Ill.2d 108, 166 N.E.2d 46, 52 (1960). It is the attorney's burden to rebut that presumption by showing by clear and convincing evidence: (i) that he made a full and frank disclosure of all relevant information; (ii) that adequate consideration was given to the client; and (iii) that the client sought independent legal counsel before completing the transaction. *See Klaskin v. Klepak*, 126 Ill.2d 376, 128 Ill.Dec. 526, 534 N.E.2d 971, 975 (1989).

Tucker defends on the basis that there was no attorney-client relationship with Debtor at the time of the two transactions. Tucker claims to have withdrawn from representing the Bergs in December 1997. *See* Findings of Fact ¶ 36. He was suspended by the Illinois Attorney Registration & Disciplinary Commission ("ARDC") from the practice of law between January 1998 and June 2000. *Id.*

In the absence of special circumstances or arrangements which show a continuation of the relationship, the attorney-client relationship terminates when the matter which the attorney was employed to conduct is resolved. *In re Timpone*, 208 Ill.2d 371, 281 Ill.Dec. 595, 804 N.E.2d 560, 568 (2004). See also *In re Imming*, 131 Ill.2d 239, 137 Ill.Dec. 62, 545 N.E.2d 715, 721 (1989) (citing *People v. Wos* 395 Ill. 172, 69 N.E.2d 858 (1946); *Herbster v. North American Co. for Life & Health Insurance*, 150 Ill.App.3d 21, 103 Ill.Dec. 322, 501 N.E.2d 343, 347 (1986)). Thus, the attorney-client relationship terminated when Tucker withdrew from representation. However, special circumstances are present in this case, including that Tucker and Debtor never used engagement letters over the many years of representation by Tucker. Tucker's representation included many different transactional and litigation matters, so that it is impossible to discern the scope and duration of the attorney-client relationship. Because of the informality with which Tucker and Debtor conducted their affairs

over an approximately twenty-year period, the line between Tucker and Debtor's professional and personal relationship was indistinguishable. However, an attorney is not relieved from his fiduciary duty to make full and frank disclosure to clients in transactions in which he may benefit simply because the attorney has a close, personal relationship with the client. *Klaskin*, 128 Ill.Dec. 526, 534 N.E.2d at 979 (citing *In re Saladino*, 71 Ill.2d 263, 16 Ill.Dec. 471, 375 N.E.2d 102, 105 (1978)).

■ In addition, the client's subjective understanding of the attorney-client relationship is highly relevant to the continuation of a fiduciary duty. *Timpone*, 281 Ill.Dec. 595, 804 N.E.2d at 567. Debtor testified that he rehired Tucker as soon as Tucker completed his suspension in June 2000 (Debtor Trial Test.), and the judicial sale occurred afterwards in July 2000. Tucker's representation of the Bergs was limited only by his ability to engage in the practice of law, and not by any specific agreement of the parties which would limit Tucker's fiduciary duties. Thus, an attorney-client relationship and, therefore a presumption of undue influence, existed between Tucker and the Bergs in July 2000.

■ Both of the Bergs testified that they believed Tucker was their attorney in April 2005. *See* Findings of Fact ¶¶ 73, 75. Tucker contends that he sent a disengagement letter to the Bergs in April 2005, although he was unable to produce it during discovery or at trial. (Tucker Trial Test.) However, the Quitclaim Deed from Debtor to Tucker was executed on April 3, 2005. Thus, even if the disengagement letter was sent (and the evidence did not corroborate that it was), it would have been sent either after the deed was signed or at best in the two days preceding execution of the Quitclaim Deed. The Illinois Supreme Court in *Timpone* and *Imming*,

found that the timing of the business transaction relative to the termination of the attorney-client relationship was a special circumstance that could militate in favor of finding a continuing fiduciary relationship. *See* 804 N.E.2d at 567–68, 545 N.E.2d at 721. Thus, even if Tucker sent the disengagement letter immediately prior to the execution of the Quitclaim Deed, the timing of the two were so close that the presumption of undue influence stemming from the attorney-client relationship continued.

■ Tucker argues that the Bergs received adequate consideration for the Property in the form of his prior legal services, which he values at $620,000. However, Tucker has not shown that he was entitled to the $620,000. *See* discussion of alleged Resulting Trust in Count V below. Therefore, that claim is not a basis for finding that there was adequate consideration for Debtor's execution of the Quitclaim Deed. Tucker did not present any other evidence to overcome the presumption of undue influence and, therefore, it is found that Tucker breached the fiduciary duty owed to Debtor.

■ When an attorney obtains an interest in client property as a result of undue influence the remedy is to vacate and set aside that interest. *See McFail*, 166 N.E.2d at 53. Thus, judgment on Count VII will be entered in favor of the Plaintiff–Trustee, and the Quitclaim Deed conveying title to the Property from Debtor to Tucker will be vacated and set aside.

### Count V: Avoidance of Fraudulent Transfer Through Foreclosure Sale

In Count V, the Trustee seeks to avoid, as a fraudulent transfer, any interest in the Property claimed by Tucker, Rothmann, Patel or the Rothmann/Tucker

Trust. Before reaching the issue of avoidance, it is first necessary to determine whether these Defendants received any interest in the Property that might be avoided. They each claim that they received some type of equitable interest, under a constructive trust or resulting trust theory asserted by Tucker, or equitable lien theory asserted by the others, as a result of financing they provided for purchase of the Property at the foreclosure sale. It is found and held that the Count V Defendants did not meet their burdens of proving that they have any right or interest in the Property. As a result, it is unnecessary to reach the issue of avoidance, and judgment on Count V will be entered in favor of Plaintiff–Trustee.

### A. Rothmann and the Rothmann/Tucker Trust have no ownership interest.

■■■■ In his post-trial proposed Findings of Fact and Conclusions of Law ("Tucker's proposed Findings and Conclusions"), Tucker attempts to introduce facts and raise arguments on behalf of Rothmann and the Rothmann/Tucker Trust. This is improper for several reasons. First, Tucker must have standing to argue these matters, and "injury in fact" is the most basic element of standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Tucker cannot assert the claims of others and therefore lacks such standing. While it is true that a trust cannot litigate on its own behalf, and the trustee is the proper party to litigate issues on behalf of the trust, *Trustees of Hotel Employees & Rest. Employees Int'l Union Welfare Pension Fund v. Amivest Corp.*, 733 F.Supp. 1180, 1184 (N.D.Ill.1990) (citations omitted), Rothmann, not Tucker is trustee of the Rothmann/Tucker Trust. Thus, Tucker does not have standing to litigate on behalf of either Rothmann or the Trust.

■■■ On November 20, 2006, an Order of Default was entered against Leonard Rothmann, which stated that "[a]ll allegations of fact shall be taken as confessed against Defendant." On January 8, 2007, a Default Judgment Order was entered as to Rothmann, declaring that "Defendant has no interest, including, but not limited to, legal, equitable or beneficial interests in the Property." Rothmann never sought pursuant to Rule 9024 Fed. R. Bankr.P. to set aside the Default Judgment and, therefore, that judgment extinguished any and all of Rothmann's legal or equitable rights to the Property.

■■■ In his Reply to the Defendants' Post Trial Proposed Findings of Fact and Conclusions of Law ("Trustee's Reply"), Plaintiff argues that the Default Judgment against Rothmann operated as a default against the Trust as well. Plaintiff does not cite any authority for this proposition, and it is found and held to be without merit.

■■■ The Rothmann/Tucker Trust was not served with summons in this case. "When a defendant has not been served with process as required by law, the court has no jurisdiction over that defendant and a default judgment entered against him or her is void." *Equity Residential Props. Mgmt. Corp. v. Nasolo*, 364 Ill.App.3d 26, 301 Ill.Dec. 467, 847 N.E.2d 126, 132 (2006); *see* 735 ILCS 5/2–206. Thus, it has been held that a return of process indicating that summons was served on an individual, and not on that individual in his/her capacity as the trustee of a trust, did not establish that the trust was served as a defendant and, therefore, such a return of process is insufficient to confer jurisdiction over either a trustee or a trust. *Price v. Dean*, 990 S.W.2d 453, 454–55 (Tex.App.Ct.1999).

Rothmann was served herein by mail in his individual capacity only, on May 23 and August 29, 2006. Tucker filed a *pro se* Answer on behalf of himself and the Trust on July 13, 2006, but, by other filings in the case, Plaintiff concedes that Tucker was not the attorney for Rothmann or the Trust nor had he any authority to act on their behalf. (*See* Mem. Regarding Trustee's Prove–Up.) On December 4, 2006, Tucker was indefinitely suspended from the practice of law for a second time, although he continued to file papers on behalf of the Trust through June 27, 2007, thereby engaging in the unauthorized practice of law. These facts establish that service of summons and Tucker's purported appearance on behalf of the Trust were insufficient to confer personal jurisdiction over the Trust when the Default Judgment was entered against Rothmann on January 8, 2007. Consequently, the Trust is not bound by the Default Judgment.

On July 20, 2007, Gloria Natoli, the attorney who drafted the purported Rothmann/Tucker Trust, filed an appearance and Answer on behalf of the Trust. Natoli had previously appeared on behalf of Patel, another former client of Tucker. This dual representation created a potential conflict of interest, and Natoli subsequently filed a Motion to Withdraw in order to substitute new counsel. Such new counsel did appear for the Trust. By these appearances the Trust yielded to *in personam* jurisdiction. However, on October 19, 2007, three days before trial, the second attorney filed a Motion to Withdraw, and continue the trial because he believed, as a result of evidence just seen by him that he could not present a defense in accordance with his client's wishes and within his ethical duties as an attorney. Out of consideration for the attorney-client privilege, counsel was not required to provide details regarding his ethical dilemma. Counsel was excused from offering evidence or conducting a defense on behalf of the Trust, but was required to remain as standby counsel to advise the Trust's trustee during trial. The Trust's Motion to continue trial was denied because the incident came after long and expensive preparation for trial by other parties. The trial went forward as scheduled but the Trust did not obtain new counsel.

While the Default Judgment did not extinguish the Trust's purported interest in the Property, the Trust did not present any evidence at trial or submit a post-trial brief. However, the trustee of the Trust participated in the trial after *in personam* jurisdiction over the Trust had attached through appearance of its counsel, and the Trust lost based on the evidence. See Findings of Fact ¶¶ 42, 65–77. The Property was never put into the Trust *res,* and the Quitclaim Deed is being vacated in Count VII. Plaintiff's allegations against the Trust are therefore found and held to be established, and judgment on Count V will be entered in favor of Plaintiff–Trustee against the Rothmann/Tucker Trust.

That leaves Tucker and Patel as the remaining Count V Defendants to be discussed.

B. *Tucker lacks a Resulting Trust Defense.*

Tucker argues that attorneys fees were earned by him but never paid by the Bergs, and that those funds were used by Debtor to purchase the Property at foreclosure sale as an accommodation to Tucker, which makes him beneficiary of a resulting trust in the Property. Tucker's request for the imposition of a resulting trust is denied. A resulting trust "is based upon the 'natural equity' that one who pays for property should enjoy it." *In re Estate of Koch,* 297 Ill.App.3d 786, 232 Ill.Dec. 189, 697 N.E.2d 931, 933

(1998). A resulting trust is an "intent enforcing trust" which arises from the presumed intent of the parties. *In re Estate of Wilson*, 81 Ill.2d 349, 43 Ill.Dec. 23, 410 N.E.2d 23, 26 (1980). "A resulting trust, unlike a constructive trust, seeks to carry out a donative intent rather than to thwart an unjust scheme. The general rule is that where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid." *In re Crossroad Health Ministry, Inc.*, 319 B.R. 778, 780 (Bankr. D.D.C.2005) (citing Collier on Bankruptcy ¶ 541.11[3] at 541–67 (15th ed. rev.2003); *United States v. Marx*, 844 F.2d 1303, 1309 (7th Cir.1988) (citations omitted)).

 Under established Illinois precedent, a resulting trust arises and vests, if at all, at the time legal title is taken by the asserted trustee. *Hanley v. Hanley*, 14 Ill.2d 566, 152 N.E.2d 879, 882 (1958). *See also In re Sacramento Real Estate*, 201 B.R. 225, 233 (Bankr.N.D.Ill. 1996); *Gary–Wheaton v. Meyer*, 130 Ill. App.3d 87, 85 Ill.Dec. 180, 473 N.E.2d 548, 555 (1984); *In re Estate of McCormick*, 262 Ill.App.3d 163, 199 Ill.Dec. 502, 634 N.E.2d 341, 345 (1994). Because resulting trusts arise by the operation of law and not by contract, they are "expressly excepted from the operation of the Statute of Frauds and may be proved by parol evidence." *Kohlhaas v. Smith*, 408 Ill. 535, 97 N.E.2d 774, 776 (1951). The burden of proof to establish such a trust is on the party claiming it, and the evidence must be clear and convincing. *In re Davenport*, 268 B.R. 159, 163 (Bankr.N.D.Ill.2001).

 Tucker argues that Debtor admitted at the foreclosure sale that he was acting as an accommodation party to Tucker. *See* Findings of Fact ¶¶ 45, 50. According to Brenner: "[Debtor] said that he was bidding at [Tucker's] request because it was [Tucker's] house, [Tucker] was living there, and that [Debtor] didn't have anything to do with how much the bid would be." *Id.* at ¶ 50. It is necessary to parse that statement in order to try to discern what Debtor was saying. At the time of the foreclosure sale, the Property was Tucker's house, and Tucker was living there, so Berg's comments on those points were mere statements of fact. The comment that Debtor did not "have anything to do with how much the bid would be," is ambiguous at best. If the evidence is doubtful or susceptible to another interpretation, it is insufficient to show a resulting trust. *Davenport*, 268 B.R. at 163. Perhaps Debtor meant that he was relying on Tucker's advice in deciding how to bid, since Tucker presumably had inside knowledge about the Property. Debtor denied ever agreeing to act as an accommodation party, and there is no evidence corroborating any agreement for Debtor to act as such. Finally, Debtor never treated the Property as belonging to Tucker; Debtor executed multiple mortgages against the Property starting almost immediately upon obtaining the judicial deed. Indeed, he treated the Property equity as his own.

 In addition, Brenner admitted that it was probably a conflict of interest for him to represent Debtor and Tucker jointly, and acknowledged that he did not obtain a written consent to the conflict. This conflict brings the impartiality of Brenner's legal advice to Debtor into question, and whether Debtor understood the legal effect of what he was saying. It has already been found that Debtor believed that Tucker was his attorney at the time of the foreclosure sale. Tucker's retention of an attorney for Debtor, who was simultaneously representing Tucker in the same transaction, did not satisfy the disclosure requirement to seek independent legal advice to rebut the presumption of undue

influence and remove the taint of doing business with a client.

■ At the heart of Tucker's claim for a resulting trust is his contention that it was his money that was used to purchase the Property at the foreclosure sale. Tucker alleges that Debtor made an oral agreement in September 1999, to pay him a flat fee of $620,000 for his work on the Hanover/MBI insurance litigation. *See* Findings of Fact ¶ 38. Tucker concedes that there is no written contract memorializing this agreement, and Debtor denies ever making this agreement. *See id.* ¶¶ 38–39. A one-third contingency fee agreement signed by Debtor on June 15, 1997 was admitted into evidence. *See id.* ¶ 32. Tucker represented both of the Bergs in the Hanover/MBI insurance litigation, but there is no written fee agreement with Mrs. Berg. *Id.*

In addition, while Tucker secured a jury verdict on behalf of the Bergs—only $28,738 for Debtor and $1,161,100 for Mrs. Berg—he then moved successfully for a new trial. *See id.* ¶¶ 29, 33. Tucker was forced to withdraw due to his suspension from practice before the new trial. *See id.* ¶ 36. Attorney Jacobus took over the case and negotiated a settlement with Hanover/MBI of $1,903,860, *see id.* ¶ 37, but the settlement was not apportioned between the Bergs. The net proceeds of settlement were deposited into the Bergs' joint bank account. *Id.* Tucker acknowledges that he is not entitled to fees for work performed after he withdrew from the case and, therefore, he is not entitled to a contingent fee under the June 15, 1997 agreement because he did not secure the settlement. (Tucker Trial Test.)

■ Tucker's withdrawal from the Hanover/MBI insurance litigation due to his suspension and lack of a proven fee agreement does not prevent him from recovering any attorneys fees. Under Illinois law, a disbarred attorney can recover fees on the basis of *quantum meruit;* his recovery "is limited to the reasonable value of the services rendered up to the time of his disbarment." *Harris Trust & Sav. Bank v. Chicago Coll. of Osteopathic Med.,* 116 Ill.App.3d 906, 72 Ill.Dec. 448, 452 N.E.2d 701, 704 (1983). Similarly, even though Tucker never had a fee agreement with Mrs. Berg, he is entitled to recover the reasonable value of services rendered under a theory of quasi-contract in order to prevent her unjust enrichment.[2] *See Sullivan v. Fawver,* 58 Ill.App.2d 37, 206 N.E.2d 492, 494 (1965) (citations omitted). The attorney bears the burden of proof in establishing the value of services performed. *Anderson v. Anchor Org. for Health Maint.,* 274 Ill.App.3d 1001, 211 Ill.Dec. 213, 654 N.E.2d 675, 681 (1995) (citing *In re Estate of Callahan,* 144 Ill.2d 32, 161 Ill.Dec. 339, 578 N.E.2d 985, 990 (1991)).

■ While Tucker certainly did work on the litigation, he did not show by clear and convincing evidence that the reasonable value of his services from the time he filed the Hanover/MBI lawsuit in April 1990 until his withdrawal in December 1997 amounts to the claimed $620,000 or any other ascertainable amount. Tucker testified that while in practice he charged $200 per hour, (Tucker Trial Test.), but

2. Tucker argues that Mrs. Berg acknowledged a $350,000 debt for attorneys fees on an August 1999 financial statement submitted to the United States Attorney in connection with a civil lawsuit with the Small Business Administration. (Tucker Ex. 61.) Contrary to Tucker's argument, this does not by itself establish that Mrs. Berg owed Tucker this amount as he had withdrawn from representation in December 1997, and Jacobus was representing the Bergs in the Hanover/MBI insurance litigation in August 1999.

there was no evidence as to the number of hours that he worked on the Hanover/MBI insurance litigation in order to corroborate the accuracy of the $620,000 figure asserted to be his rightful fee. When Tucker was suspended from the practice of law, he moved his records into storage at the BMSC warehouse, and those records were disposed of when the Assignment for Benefit of Creditors was executed and a Receiver took control of the business. *See* Findings of Fact ¶ 40(b). As a result, there are no time sheets or detailed billings to corroborate Tucker's testimony as to the number of hours he worked on the case. Tucker would like to extrapolate backwards from the claimed $620,000 and billing rate of $200 per hour to the conclusion that he worked 3,100 hours on the Hanover/MBI insurance litigation. However, this is not a simple problem of arithmetic. The "lodestar" method for awarding fees multiplies the reasonable hours actually worked times a reasonable hourly rate, usually the prevailing hourly rate in the community or the rate usually billed and collected by the lawyer. *Hyland v. Indicator Lites, Inc.*, 160 F.Supp.2d 981, 984 (N.D.Ill.2001). The attorney claiming the fees has the burden of proving the number and reasonableness of the hours expended, including time sheets and detailed billing records. *Id.* That evidence is lacking here. In addition, while Tucker testified that the Bergs' received a credit of $157,000 for litigation expenses advanced but not spent, that amount is never accounted for on the bills, which would further reduce Tucker's claimed fee. *See* Findings of Fact ¶ 40(f). There is serious doubt as to authenticity of the few purported fee statements that were produced, and they are not an adequate or proper basis for determining the reasonable value of Tucker's services.

Tucker also argues that the $620,000 that began appearing on supposed "bills" purportedly sent to Debtor starting in January 1998, constitutes an "account stated." An account stated is a method of determining the amount of a preexisting debt when parties, who previously have conducted monetary transactions, agree that there is an account representing the transactions between them, one party renders a statement of account to another, and the latter retains the statement beyond a reasonable amount of time without objection. *ITQ Lata, LLC v. MB Fin. Bank, N.A.*, 317 F.Supp.2d 844, 858 (N.D.Ill.2004) (citing *Best Buy Co., Inc. v. Harlem–Irving Cos., Inc.*, 51 F.Supp.2d 889, 899–900 (N.D.Ill.1999)). The retention of the statement of account for an unreasonable amount of time without objection may constitute an implied acknowledgment and recognition by the recipient of correctness of the account. *Id.* (citing *Motive Parts Co. of Am., Inc. v. Robinson*, 53 Ill.App.3d 935, 11 Ill.Dec. 665, 369 N.E.2d 119, 122 (1977)). What constitutes a reasonable amount of time to object depends upon the circumstances of the case, the ordinary course of business, and the relationship of the parties. *Id.* (citing *Chi. & E. Ill. R.R. v. Martin Bros. Container & Timber Prods. Corp.*, 87 Ill.App.3d 327, 42 Ill.Dec. 322, 408 N.E.2d 1031, 1036 (1980)).

Tucker's claim for an account stated fails for a number of reasons. First, a claim for an account stated cannot be supported by an underlying transaction that is void or illegal. *White v. Turner–Hudnut Co.*, 322 Ill. 133, 139, 152 N.E. 572 (1926). That rule is applicable here, because according to Illinois Supreme Court Rule 764(h)(1), "*Matters in which Legal Proceedings Instituted.* The disciplined attorney shall not receive any compensation regarding a matter in which a legal proceeding was instituted at any time pri-

or to the imposition of discipline without first receiving approval of the tribunal." Tucker did not seek or receive that approval. The Illinois Attorney Registration & Disciplinary Commission has suggested that a fee arrangement negotiated without its approval while an attorney is under suspension is void and unenforceable. *In re Gary Steven Tucker*, No. 04 CH 89, at 8 (Ill. ARDC Dec. 4, 2006). At trial, Tucker conceded that he did not comply with Rule 764(h)(1), but suggested that his noncompliance was a mere technicality because his law license was later reinstated by the time the Property was sold at foreclosure. (Tucker Trial Test.) However, the Rules of Professional Conduct are not technicalities. They are there to protect the public, maintain the integrity of the legal system and safeguard the administration of justice. *In re Howard*, 188 Ill.2d 423, 242 Ill.Dec. 595, 721 N.E.2d 1126, 1132 (1999). Furthermore, an attorney who has been disciplined previously should have "a heightened awareness of the necessity to conform strictly to all of the requirements of the Rules of Professional Conduct." *In re Storment*, 203 Ill.2d 378, 272 Ill.Dec. 129, 786 N.E.2d 963, 976 (2003). Thus, the purported fee agreement is void and unenforceable under Illinois law as a violation of Supreme Court Rule 764(h)(1) and, therefore, it cannot support a claim for an account stated.

■■■ Second, in light of the relationship of the parties and the course of dealing between Tucker and Debtor, it is found and held that Debtor did not retain the supposed billing statements for an unreasonable amount of time before objecting to them. The statements were dated approximately twenty-one months prior to the date when the purported fixed fee agreement was made in September 1999, *see* Findings of Fact ¶ 40(c), and can hardly be treated as documentation of a fee allegedly

agreed to much later. Tucker responded that those statements were for "informational purposes" only, whatever that means. *Id.* Debtor cannot be charged with retaining the statements for an unreasonable time if they were for informational purposes and did not truly reflect an amount claimed and supposedly agreed to as legal fees. In addition, Debtor testified that he suggested that he and Tucker arbitrate their fee dispute regarding the Hanover/MBI insurance litigation, but instead they agreed to resolve that dispute informally sometime in the future. (Debtor Trial Test.) That testimony is evidence that Debtor did object to the amounts reflected on the statements and, therefore, there was no account stated.

■■ Because of his lack of credible records, Tucker has failed to establish the amount of attorneys fees that he might be entitled to on a *quantum meruit* basis or on a contract basis. He waived his lien claims on the litigation recovery as part of his scheme to avoid taxes. Were it not for the mistakes he made to avoid the IRS and ARDC, Tucker might be viewed as a sympathetic lawyer who will not be paid for work he did for Debtor. But he is hoisted on his own petard and cannot claim sympathy. He has not shown by clear and convincing evidence that his money was used to pay any part of the purchase price for Debtor's interest in the Property. Accordingly, Tucker is not the beneficiary of a resulting trust regarding property of the bankruptcy Estate.

C. *Tucker lacks a constructive trust defense.*

■■■ Tucker's request for the imposition of a constructive trust on the Property is also denied. A constructive trust arises by operation of law. It is a device by which a court compels one who unfairly holds property to convey the property to

the party to whom it justly belongs. *People ex rel. Hartigan v. Candy Club*, 149 Ill.App.3d 498, 103 Ill.Dec. 167, 501 N.E.2d 188, 191 (1986); *A.T. Kearney, Inc. v. INCA Intern., Inc.*, 132 Ill.App.3d 655, 87 Ill.Dec. 798, 477 N.E.2d 1326, 1332 (1985) (citing *Zack Co. v. Sims*, 108 Ill.App.3d 16, 63 Ill.Dec. 732, 438 N.E.2d 663 (1982)). Absent coercion, duress, or mistake a constructive trust is generally imposed in only two situations: (1) where actual or constructive fraud is considered as equitable grounds for raising the trust; and (2) where there is a fiduciary duty and a subsequent breach of that duty. *See, e.g., Bressner v. Ambroziak*, 379 F.3d 478, 483–84 (7th Cir.2004) (a constructive trust will not be imposed unless the claimant makes a showing of wrongdoing, such as fraud, breach of fiduciary duty, duress, coercion or mistake); *Davis v. Combes*, 294 F.3d 931, 936 (7th cir.2002); *Amendola v. Bayer*, 907 F.2d 760, 762–63 (7th Cir.1990). The elements of a constructive trust action are the existence of identifiable property to serve as the *res* upon which a trust can be imposed, and possession of that *res* or its product by the person who is to be charged as the constructive trustee. *Candy Club*, 103 Ill.Dec. 167, 501 N.E.2d at 191.

However, a constructive trust cannot be imposed post-bankruptcy, as any rights recognized in bankruptcy must have been found under non-bankruptcy law prior to filing of the bankruptcy petition. *See Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation Inc.)*, 351 B.R. 529, 593 (Bankr.N.D.Ill.2006); *In re Davenport*, 268 B.R. 159, 163 (Bankr.N.D.Ill.2001) (citing *Stevens v. Century Furniture Co. (In re CL Furniture Galleries, Inc.)*, 95 C 50103, 1995 WL 756853, at *8 (N.D.Ill.Dec.20, 1995) (in order to prevail on a theory of constructive trust, debtor must have acquired a judicially imposed constructive

trust prior to the filing of debtor's bankruptcy petition)). It is settled law that while the Bankruptcy Code gives the trustee rights in certain property, the extent of those rights are governed by state law. *Butner v. U.S.*, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Constructive trust is an equitable remedy that must be adjudicated by a court. *Stevens*, 1995 WL 756853, at *8. The rationale of cases holding that any right to a constructive trust must be established pre-bankruptcy is based on the view that the interest of the bankruptcy trustee, as a hypothetical judicial lien creditor, lien creditor or bona fide purchaser of real property, would be superior to that of any equitable interest granted post-bankruptcy. *See Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 439 (7th Cir.1980).

Tucker concedes that he is not the beneficiary of a judicially imposed pre-petition constructive trust, but urges that the foregoing precedents be revisited because, he argues, applying their holding in this case would sanction the kind of wrongful conduct that a constructive trust is intended to remedy. (*See* Tucker's proposed Findings and Conclusions at 7.) That bootstrapping argument is not persuasive. Nor can a bankruptcy judge question the holdings of the Supreme Court in *Butner* and the Seventh Circuit in *Pubs, Inc.* For that reason, it is unnecessary to discuss the merits of a claim for constructive trust that was not adjudicated pre-bankruptcy.

D. *Patel lacks an equitable lien.*

Patel placed $158,182.97 for the use of Debtor to acquire the Property at the foreclosure sale. At the time Patel placed said money for use to purchase the Property, he says that he believed the money would be repaid by Tucker or Debtor. Debtor did repay $50,000. Patel says that he expected his money would be se-

cured by the Property. Debtor testified that he was not certain if Patel was to be secured. (Debtor Trial Test.) There was no written agreement or written corroboration of Patel's expectation.

■■■ An equitable mortgage arises when money is loaned or credit given in reliance on security of property of the debtor. *Wilkinson v. Johnson*, 29 Ill.2d 392, 194 N.E.2d 328, 332 (1963); *In re Cutty's–Gurnee, Inc.*, 133 B.R. 934, 944–45 (Bankr.N.D.Ill.1991); *In re BNT Terminals, Inc.*, 125 B.R. 963, 971 (Bankr. N.D.Ill.1990). An equitable mortgage lien operates on specific property and is the right to have property subjected to payment of a claim. *Pacini v. Regopoulos*, 281 Ill.App.3d 274, 282, 216 Ill.Dec. 433, 439, 665 N.E.2d 493, 499 (1996). The doctrine of equitable mortgage is based upon the principal that equity will interpret an agreement according to the intent of the parties and will give it effect though it does not meet the technical requirements of the law. *Trs. of Zion Methodist Church v. Smith*, 335 Ill.App. 233, 81 N.E.2d 649, 650 (1948).

■■■ Equitable liens are not contrary to bankruptcy laws and such liens may be sufficient in bankruptcy if valid pursuant to state law. *Small v. Beverly Bank*, 936 F.2d 945, 949 (7th Cir.1991). Equitable liens arise either by written contract or the relationship and dealings had between the parties. *Id.* The intent of the parties is significant with respect to the creation of an equitable lien. *National Bank of Albany Park in Chicago v. Newberg*, 7 Ill.App.3d 859, 289 N.E.2d 197, 202 (1972).

Patel argues that it was Debtor's intent to grant him a security interest in the Property and, therefore, he holds an equitable lien on the Property. (*See* Br. in Supp. of Bhagvan Patel ("Patel Br.") at 2.) In his post-trial Briefs, Patel cites a string of cases for the proposition that "equity will interpret an agreement according to the intent of the parties and will give it effect though it does not meet the technical requirements of the law," and that "the intent of the parties is significant with respect to the creation of an equitable lien." (*Id.* at 2–3 (citing *Zion Methodist Church*, 81 N.E.2d at 650; *see Nat'l Bank of Albany Park in Chicago v. Newberg*, 7 Ill.App.3d 859, 289 N.E.2d 197, 202 (1972)).) However, the evidence and Patel's conclusory arguments fail to show that it was Debtor's intent to grant him a lien against the Property. Patel provided a total of $158,182.97 to Debtor used for purchase of the Property, see Findings of Fact ¶ 47(b), $50,000 of which was repaid. The fact that Patel made funds available to Debtor, which Debtor used to purchase the Property at foreclosure sale is insufficient to establish an equitable lien. The weight of evidence does not show any agreement, written or oral, express or implied, by which Debtor agreed to make the Property comprise security for the debt incurred by the Debtor to Patel. At trial, Patel testified that on the occasions when he sought repayment, he made those demands on Tucker, and that he "assumed" that he had a security interest if Tucker could not pay the money back. (Patel Trial Test.) In fact, Patel only met Debtor once before loaning him the money. (Patel Trial Test.) Having failed to carry his burden of proof that it was Debtor's intent to grant him a security interest in the Property, Patel's request for an equitable lien will be denied.

### E. *Conclusion as to Count V.*

Having determined that Tucker, Rothmann, Patel and the Rothmann/Tucker Trust did not receive any interest in the Property at the time of the foreclosure sale, it is unnecessary to reach the issue of avoidance. In other words, Plaintiff's at-

tempt to avoid the claimed interests under 11 U.S.C. § 544(b) is moot. Therefore, judgment on Count V will be entered in favor of Plaintiff–Trustee, declaring that none of those parties ever received any interest in the Debtor's one-half interest in the Property.

### *Count VI: Avoidance of Quitclaim Deed as a Fraudulent Transfer*

Plaintiff advances two theories as to the avoidance of the Quitclaim Deed. First, he seeks to avoid the transfer pursuant to 11 U.S.C. § 548(a)(1) as a fraudulent transfer. Alternatively, he argues that the transfer is invalid under Illinois law as the product of undue influence. See discussion of Count VII above. It is found and held that Plaintiff prevails under either theory and, therefore, judgment on Count VI will be entered in his favor.

 According to 11 U.S.C. § 548(a)(1):

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transaction was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . .

It is possible to prove actual intent to defraud through circumstantial evidence. *Frierdich v. Mottaz,* 294 F.3d 864, 869–70 (7th Cir.2002) (citations omitted). These so-called "badges of fraud" include:

[W]hether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer.

*Id.* at 870. However, this is a rare case where the Debtor confessed from the stand in effect that the transfer was made with the intent to hinder, delay or defraud his creditors. (*See* Debtor Trial Test.) At trial, Debtor testified that he discussed his financial difficulties with Tucker in early 2005.(*Id.*) When Tucker came to the Bergs' home on Sunday, April 3, 2005, and asked them to sign the Quitclaim Deed, Debtor believed that Tucker was acting as his attorney and that executing the deed was a way to protect Debtor's assets from his creditors. (*Id.*) Contrary to Debtor's argument, acting on the advice of counsel does not negate a debtor's wrongful intent. *In re Sundstrom,* 374 B.R. 663, 670 (Bankr.E.D.Wis.2007) (citing *In re Watman,* 458 F.3d 26, 34 (1st Cir.2006)). Thus, by his own admission, Debtor acted with actual intent to hinder, delay or defraud his creditors when he executed the Quitclaim Deed on April 3, 2005, and, therefore, the transfer will be avoided pursuant to 11 U.S.C. § 548(a)(1). Having found earlier that Tucker devised the scheme by which the Bergs would take title to the Property at a foreclosure sale

to help Tucker avoid paying his taxes, this admission by Debtor makes evident yet another wrongful use of the Property.

Tucker defends on the basis that he paid adequate consideration for the Property, and that Debtor was not insolvent at the time of the transfer. Subparagraphs (A) and (B) of § 548(a)(1) are connected with the disjunctive "or", and embody the distinction between "fraud in fact", and "fraud in law" or constructive fraud. *See In re Knippen*, 355 B.R. 710, 721 (Bankr.N.D.Ill.2006). "[T]he adequacy or equivalence of consideration provided for the actually fraudulent transfer is not material to the question whether the transfer is actually fraudulent...." *Id.* (quoting *Plotkin v. Pomona Valley Imps., Inc. (In re Cohen)*, 199 B.R. 709, 716–17 (9th Cir. BAP 1996)). Trustee has proven fraud in fact by Debtor's admission that he executed the Quitclaim Deed with the belief that doing so was a way to protect assets from his creditors and, therefore, that he had actual intent to hinder, delay or defraud those creditors in bankruptcy. Thus, Tucker's defenses are irrelevant to the resolution of Count VI.

Nevertheless, Tucker's argument regarding adequate consideration fails for the same reasons outlined in the discussion as to Tucker's prayer for a resulting trust in Count V. Tucker failed to prove the reasonable value of his services for work performed on the Hanover/MBI insurance litigation and, therefore, his claim that the transfer by the Quitclaim Deed was in satisfaction of a preexisting debt is without merit. However, subparagraphs (B)(i) and (B)(ii) of § 548(a)(1) are connected with the conjunctive "and," so that one has to prove insolvency as well as lack of adequate consideration to prevail on a constructive fraud theory. Insolvency is defined by the Code and means:

(A) with reference to an entity ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title.

11 U.S.C. § 101(32). Essentially, the bankruptcy court employs a balance sheet approach to measuring insolvency. *Knippen*, 355 B.R. at 722 (citing *Steege v. Affiliated Bank/N. Shore Nat'l (In re Alper-Richman Furs, Ltd.)*, 147 B.R. 140, 154 (Bankr.N.D.Ill.1992)). "A trustee may utilize appropriate means to prove insolvency, including balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence." *Id.* (citing *Freeland v. Enodis Corp. (In re Consol. Indus. Corp.)*, 292 B.R. 354, 360 (N.D.Ind.2002)). That includes the testimony of Debtor and his bankruptcy schedules. *See id.*

At trial Debtor, testified that his financial condition outlined on his bankruptcy schedules reflected his assets and liabilities at the time he executed the Quitclaim Deed on April 3, 2005. According to his Summary of Schedules, Debtor had total assets of $880,833.00, which included the Property valued at $640,000, and total liabilities of $1,532,674.72. Pursuant to § 101(32)(A)(i), the $640,000, must be excluded in measuring Debtor's solvency, which would reduce his total assets to approximately $240,883. But whether or not that is excluded, it is evident and therefore found and held that Debtor was insolvent at the time he executed the Quitclaim Deed.

Plaintiff has therefore proven by preponderance of the evidence that the Quitclaim Deed was a fraudulent transfer un-

der both a fraud in fact and constructive fraud theory. In addition, Tucker did not rebut the presumption of undue influence and, therefore, this transaction between attorney and client is void as a matter of Illinois law. *See,* discussion of Count VII, above. For the foregoing reasons, judgment on Count VI will be entered in favor of Plaintiff–Trustee, and the Quitclaim Deed will be voided and set aside to the extent it affected property of the bankruptcy Estate.

### Count IV: A Quiet Title Decree will be Entered

In Count IV, Plaintiff seeks to quiet title to the Property in favor of the bankruptcy Estate. On March 25, 2005, Tucker, Rothmann and Patel filed a Complaint for Constructive Trust and to Quiet Title against Debtor and Frisbie in the Illinois Circuit Court of Cook County, Chancery Division. On the same day, Tucker, Rothmann and Patel recorded a *lis pendens* on the Property. The Chancery Case was stayed by the filing of Debtor's bankruptcy case.

An action to quiet title to real property can be maintained only by one who holds legal or equitable title to the property, which is good against the alleged cloud or superior to that of the defendant. *See Lakeview Trust & Sav. Bank v. Estrada,* 134 Ill.App.3d 792, 89 Ill.Dec. 569, 480 N.E.2d 1312, 1327 (1985). A plaintiff must recover on the strength of his own title, although he is not required to establish a perfect title, and a plaintiff who has no title himself cannot complain that there is a cloud upon the title. *Id.*

Plaintiff argues that interest of Debtor in the Property became property of the Estate pursuant to either 11 U.S.C. §§ 541(a)(1) or 541(a)(3). According to § 541(a)(1):

The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interest of the debtor in property as of the commencement of the case.

Tucker responds that the Property never became property of the Estate because, under 11 U.S.C. § 541(d), property to which a debtor only holds legal title, while others hold equitable title or other ownership interest, does not become property of the Estate. *See Whiting Pools, Inc.,* 462 U.S. at 205, 103 S.Ct. 2309 ("Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition."). Tucker's argument is without merit. For reasons set forth in the discussion of Counts V and VI above, it is found and held that Tucker did not ever obtain equitable title to the Property under either a resulting trust or constructive trust theory, and that the transfer by the Quitclaim Deed is avoided as a fraudulent transfer and a nullity under Illinois law. In discussion of other counts, it is found and held that claims by others against property of the Estate also fail.

The judicial deed issued following the foreclosure sale conveyed a fee simple absolute interest in the Property to Debtor and Mrs. Berg as tenants by the entirety. The Bergs concede that the Property was never their homestead and, therefore, under Illinois law they held title as joint tenants. 765 ILCS 1005/1c; *Premier Prop. Mgmt., Inc. v. Chavez,* 191 Ill.2d 101, 245 Ill.Dec. 394, 728 N.E.2d 476, 479 (2000). Therefore, Debtor's one-half interest in the Property became property of the Estate pursuant to 11 U.S.C. § 541(a)(1), and it is unnecessary to reach Plaintiff's alternative theory regarding 11 U.S.C. § 541(a)(3).

For the foregoing reasons, judgment on Count IV will be entered in favor of Plaintiff–Trustee quieting title in favor of the Estate as to an undivided one-half interest in the Property.

*Conclusion as to Property of the Estate*

Plaintiff has prevailed in his contention that an undivided one-half interest in the Property is property of the bankruptcy Estate. Therefore, the discussion turns to claims against that interest.

## COUNTS I–III: AVOIDANCE OF CONSENSUAL LIENS

*Count I: Avoidance of Frisbie Mortgage*

In Count I, Plaintiff seeks to avoid, pursuant to 11 U.S.C. § 544(a)(3), a purported consensual mortgage lien held by Frisbie against the Property, because it is alleged that the asserted lien document does not comply with Illinois law. *See* 765 ILCS 5/11. The two essential elements of a mortgage in Illinois are a "debt, legal liability, or obligation to be secured and a conveyance with an intention to secure that debt or obligation." *In re Pak Builders*, 284 B.R. 650, 663 (Bankr.C.D.Ill., 2002) (quoting *Caraway v. Sly*, 222 Ill. 203, 78 N.E. 588, 589 (1906)). Furthermore, the statute providing for a statutory form of mortgage requires that a mortgage in that form recite the nature and amount of the indebtedness, showing when due and the rate of interest, and whether secured by note or otherwise. *See Caraway*, 78 N.E. at 589; 27 Ill. Law and Prac. Mortgages § 24 (2007). Plaintiff argues that the Frisbie Mortgage does not state the amount owed to the mortgagee, the interest rate or maturity date as required by Illinois law, and does not attach the promissory notes which the mortgage allegedly secures. In addition, Plaintiff contends that if the purported eHome Mortgage is avoided, he may step into eHome's shoes and take advantage of the Subordination Agreement that Frisbie executed in favor of eHome. Frisbie defends by arguing that the mortgage sufficiently describes the underlying debt so as to put the world on notice that the Property was encumbered, and that to the extent the eHome Mortgage is avoided the Subordination Agreement is likewise void.

Pursuant to the so-called "strong-arm" provision contained in 11 U.S.C. § 544(a)(3), the Bankruptcy Code grants to the trustee at the commencement of the bankruptcy case, the hypothetical status, rights, and powers of a bona fide purchaser of real property who has perfected the transfer of real property from the debtor at the time of the bankruptcy filing. Consequently, the trustee is able to avoid any transfer of the debtor's property that the hypothetical bona fide purchaser could avoid "without regard to any knowledge of the trustee or of any creditor." *Id.* It is found and held here that the Frisbie Mortgage does not comply with the Illinois Conveyance Act, and therefore, it was insufficient to provide constructive notice to a hypothetical bona fide purchaser.

According to the Illinois Conveyances Act ("Act"):

Mortgages of lands *may* be substantially in the following form:

The Mortgagor (here insert name or names), mortgages and warrants to (here insert name or names of mortgagee or mortgagees), to secure the payment of (here recite the nature and amount of indebtedness, showing when due and the rate of interest, and whether secured by note or otherwise), the following described real estate (here insert description thereof), situated in the County of . . ., in the State of Illinois.

Dated (insert date).

(signature of mortgagor or mortgagors)

765 ILCS 5/11 (emphasis added).

Plaintiff relies on *Bullock v. Battenhousen,* 108 Ill. 28 (Ill.1883), which held that "[t]he policy, though not the letter, of our statutes requires, in all cases, a statement upon the record of the amount secured." The reasoning behind this requirement is not only to provide notice to the world of the fact that the property is encumbered by a lien, (*see* Defendant Michael Frisbie's Post Trial Proposed Findings and Facts and Conclusions of Law ("Frisbie proposed Findings and Conclusions") at 6–7 ¶ 4), but also to "prevent[ ] secret conspiracies between mortgagors and mortgagees as to the fact and amount of indebtedness to the prejudice of subsequent purchasers and creditors, by compelling them to at once make known the real claim." *Id. See also Gardner v. Cohn,* 191 Ill. 553, 61 N.E. 492, 493 (1901) (applying the same standard when approving a mortgage) ("Everything necessary to define the nature of the mortgage indebtedness was accurately set forth in the record of the mortgage, so that another indebtedness could not have been substituted for it.").

Frisbie argues that Plaintiff's reliance on *Bullock* is misplaced, and that the use of the word "may" in the Act demonstrates that the statutory form of mortgage described in the Illinois Conveyance Act is permissive. In support of this position, he cites several cases for the proposition that a mortgage will not be invalidated due to technical defects if it serves the general purpose of providing notice of the encumbrance. *In re Bailey,* 999 F.2d 237, 241 (7th Cir.1993); *Gardner,* 61 N.E. at 493. As discussed below, the cases cited by Frisbie are distinguishable from the facts here, and *Bullock* remains valid precedent.

 Frisbie first attacks *Bullock* as "almost 125 years old," and argues that the Illinois statute interpreted in that case is "obsolete." (Frisbie proposed Findings and Conclusions at 6 ¶ 3.) The age of a precedent is not by itself sufficient to attack the validity of its holding. Under principles of *stare decisis,* Illinois Supreme Court precedent is valid until overruled by the Illinois Supreme Court, United States Supreme Court, or limited by subsequent legislation. *Kelley v. Sheriff's Merit Comm'n of Kane County,* 372 Ill.App.3d 931, 310 Ill.Dec. 541, 866 N.E.2d 702, 705–06 (2007). In 1993, the organizational and numbering scheme by which Illinois statutes are referenced was changed from "Illinois Revised Statutes" to "Illinois Compiled Statutes", but nowhere "does it state that the statutes themselves are new or that the Illinois Revised Statutes are no longer in existence." *People v. Suastegui,* 374 Ill.App.3d 635, 312 Ill.Dec. 745, 871 N.E.2d 145, 149 (2007). Indeed, a comparison of the statute in effect at the time of *Bullock* and the current Illinois Conveyance Act reveals that they are almost identical, and both employ the permissive word "may." 765 ILCS 5/11; cf. Ill.Rev.Stat., § 11, ch. 30 (1874).

It is true that some opinions of Illinois courts post-*Bullock* have recognized some flexibility in reading the statutory requirements for an Illinois mortgage. For example, it has been held that specifying the amount of indebtedness in the mortgage was unnecessary where the mortgage listed the interest rate, periodic interest payments and date of maturity so that one could calculate the principal amount, *Gardner,* 61 N.E. at 493; where the mortgage secured future advances not to exceed the amount of indebtedness listed on the mortgage, *Skach v. Gee,* 137 Ill.App.3d 216, 91 Ill.Dec. 882, 484 N.E.2d 441, 443 (1985); and where the mortgage and note secured by it mutually refer to one another, *Bailey,* 999 F.2d at 242. In other words, in those

cases the amount of mortgage lien was evident or calculable even though not specified, so third parties reading the recorded instrument were on notice of the mortgage debt.

The facts of this case are different, and highlight the wisdom of the rule requiring a mortgage to contain sufficient distinguishing characteristics of the note that it secures. The Frisbie Mortgage was executed on February 22, 2001, and recorded on March 5, 2001. (JX C.) It purports to secure two demand notes dated August 23, 1998, and July 28, 2000.(*Id.*) However, it does not list or indicate the principal amount or applicable interest rate for either note except for the ambiguous clause "as provided in said Notes...." (*Id.*) No notes were attached to or made part of the Mortgage. A promissory note dated July 28, 2000, in the amount of $100,000 at fifteen percent (15%) interest was entered into evidence. *See* Findings of Fact ¶ 59. However, the July 28th Note does not state that it is secured by the Frisbie Mortgage. *Id.* Frisbie contends that the August 23, 1998 note referenced in the Mortgage was for a $250,000 debt, but there is no note in evidence of that date. *See id.* ¶ 60. Rather there is a promissory note for $250,000 dated July 23, 1998, the date of which appears to have been altered on its face. *Id.* The July 23rd Note does not state that it is secured by the Frisbie Mortgage. *Id.* During his testimony at trial, Frisbie withdrew his secured claim as to the $250,000 note due to the discrepancy between the Mortgage and the July 23rd Note. *Id.*

Of all the characters involved in this case, Frisbie is the most sympathetic because he is a private person who did advance money. However, "[i]f 'hard cases make bad law,' unusual cases surely have the potential to make even worse law." *Department of Air Force v. Rose,* 425 U.S. 352, 383, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (Burger, C.J., dissenting). Frisbie loaned substantial sums to the Bergs and BMSC over the years. (Frisbie Trial Test.) As of 2005, the Bergs owed Frisbie $1.1 million. (*Id.*) According to Frisbie, all notes with Berg were negotiated as demand notes. (*Id.*) When asked on crossexamination, why he did not require regular interest payments on the notes, Frisbie replied that he considered the fifteen percent interest a good rate of return on his investment and, therefore, was satisfied by Debtor's *de minimis* interest payments. (*Id.*) This informal arrangement seemed to satisfy both parties when Debtor and his business were flush, but it is now impossible to reform and correct the mortgage documents against the claim of the Plaintiff bankruptcy trustee who is under law a hypothetical bona fide purchaser without notice.

In *Bailey,* where a Seventh Circuit panel refused to invalidate the mortgage based on an insignificant variance from the statutory requirement, the opinion recognized "that reformation should not be permitted when it adversely affects the rights of an intervening third party or a purchaser for value without notice." 999 F.2d at 242. Plaintiff must be treated as an innocent third party by virtue of his avoiding powers as a bankruptcy chapter 7 trustee under 11 U.S.C. § 544(a)(3). Without some recorded indicia of reliability tying the Frisbie Mortgage to the July 28th Note it is impossible to say by the preponderance of the evidence that it is in fact the note secured by the recorded Mortgage. Because the Frisbie Mortgage does not comply with the requirements of the Illinois Conveyance Act, Plaintiff as a hypothetical bona fide purchaser cannot be charged with constructive notice of the Mortgage. Therefore, the Mortgage will be avoided as to property of the Estate, and

Judgment on Count I will be entered in favor of Plaintiff–Trustee.

### Counts II and III: Avoidance of eHome Mortgage

In Count II, Plaintiff seeks to avoid, as a post-petition transfer pursuant to 11 U.S.C. § 549, a mortgage purportedly held by eHome against the Property. In addition, Plaintiff alleges that the act of perfecting the security interest by recording the mortgage post-bankruptcy was a violation of the automatic stay pursuant to 11 U.S.C. § 362(a)(4). Finally, Plaintiff seeks to preserve the avoidance for benefit of the Estate pursuant to 11 U.S.C. § 551.

Wilshire was the servicer of the eHome Mortgage, and did not hold a separate mortgage of its own against the Property. However, in Count III, Plaintiff seeks to avoid, pursuant to 11 U.S.C. § 544(a)(3), any mortgage purportedly held by Wilshire against the Property, because the legal description in the eHome Mortgage describes a parcel of real property in New York, and was allegedly recorded there and, therefore, is an unperfected security interest under Illinois law. In addition, Plaintiff seeks to preserve the avoidance for benefit of the Estate pursuant to § 551.

EHome defends by arguing that the post-petition recording of a mortgage that was granted pre-bankruptcy is not a post-petition transfer under § 549, and can only be avoided pursuant to § 544(a)(3), a theory which it argues Plaintiff did not advance in his pretrial Proposed Findings of Fact and Conclusions of Law ("Trustee's pretrial proposed Findings and Conclusions") and it was therefore waived. In addition, eHome argues that only the recording of the mortgage violated the automatic stay and, therefore, Plaintiff needs an independent basis, such as § 544(a)(3), for avoiding eHome's unperfected lien. Finally, eHome argues that it was subrogated to the rights of AEB, whose mortgage eHome refinanced, or, in the alternative, that the eHome Mortgage was an improvement to the Property pursuant to 11 U.S.C. § 550(e)(2)(D).

Count II thereby raises four threshold issues, including: (1) whether the post-petition recording of a mortgage granted pre-petition is a post-petition transfer; (2) the scope of the remedy for eHome's alleged violation of the automatic stay; (3) whether eHome was subrogated to the rights of AEB when it refinanced the AEB Mortgage; and (4) whether the refinancing constitutes an improvement for purposes of § 550(e)(2)(D).

EHome and Wilshire were represented by the same counsel at trial. They contend in Count III that there was never a Wilshire Mortgage, nor was the eHome Mortgage that was executed ever recorded in New York. In addition, eHome concedes that an incorrect legal description was attached to its Mortgage, but argues that the correct street address and PIN for the Property was listed on the face of its mortgage and, therefore, it is valid under Illinois law. Finally, eHome argues that Trustee's pretrial proposed Findings and Conclusions superceded his other pleadings and did not advance the legal theories pleaded under § 544(a)(3) in Count III and, therefore, those arguments were waived.

On July 16, 2004, eHome lent $470,000 to Debtor, and a mortgage on the Property securing that debt was executed on the same day. (See eHome Exs. 3–4.) The eHome loan and Mortgage refinanced a previous loan from AEB, which was evidenced by a properly recorded mortgage. (See eHome Ex. 2.) EHome did not record its mortgage for more than sixteen months until November 30, 2005, after Debtor's bankruptcy petition had been filed. See Findings of Fact ¶ 62. Plaintiff now seeks

to avoid the eHome Mortgage on three theories: (1) recording of the Mortgage was a violation of the automatic stay under 11 U.S.C. § 362(a)(4) and, therefore, is void; (2) recording of the Mortgage was a post-petition transfer and, therefore, can by avoided pursuant to 11 U.S.C. § 549(a); and (3) the Mortgage can be avoided using the Trustee's strong-arm powers under 11 U.S.C. § 544(a)(3) as a hypothetical bona fide purchaser of real property. EHome concedes that recording the Mortgage was a violation of the automatic stay as to Debtor, but contends that this only voids the act of recording but not the lien itself. In addition, eHome argues that the post-petition recording of a pre-petition lien is not a transfer for purposes of 11 U.S.C. § 549(a). Finally, eHome contends that it stepped into the shoes of AEB under a theory of conventional subrogation, or that its loan was an improvement to the Property under 11 U.S.C. § 550(e)(2)(D).

### A. *Recording the mortgage was not a postpetition transfer.*

■ According to 11 U.S.C. § 549(a)(1), "Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—that occurs after the commencement of the case...." Plaintiff cites *Thompson v. Margen (In re McConville)*, 110 F.3d 47 (9th Cir.1997), for the proposition that eHome cannot assert the good faith purchaser defense in 11 U.S.C. § 549(c). Plaintiff has put the cart before the horse; whether eHome can assert the statutory defense in § 549(c) is irrelevant to whether Plaintiff has established a *prima facie* case for lien avoidance under § 549(a). In fact, *Thompson* does not even stand for the proposition suggested by Plaintiff. That was the holding of the bankruptcy court, which was affirmed by the district court. However, the Court of Appeals for the Ninth Circuit never reached that question in the *Thompson* opinion, because "the creation of a lien does not transfer property for purposes of § 549." *Id.* at 49.

■ According to 11 U.S.C. § 101(54), "'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." The recording of a mortgage does not fall within this definition. *Gold v. Nat'l City Home Loan Servs. (In re Hamama)*, 319 B.R. 851, 853 (Bankr.E.D.Mich.2005). Second, even if it was a transfer, it is generally held that the post-petition recording of a mortgage granted pre-petition is not a post-petition transfer under § 549(a). *See In re Elam*, 194 B.R. 412, 415 (Bankr.E.D.Tex.1996); *In re Hayes*, No. 96–21384KD, 1996 WL 1038496, at *7 (Bankr.N.D.Iowa, Dec.10, 1996); *In re Minton Group, Inc.*, 27 B.R. 385, 392 (Bankr.S.D.N.Y.1983). Thus, Plaintiff–Trustee cannot avoid the eHome Mortgage as a post-petition transfer pursuant to 11 U.S.C. § 549(a).

### B. *Recording the mortgage to perfect it is void against property of the Estate as a violation of the automatic stay.*

■ The filing of a bankruptcy petition operates as a stay, applicable to all entities, of various acts, including "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). Recording of the eHome Mortgage against the Property after the bankruptcy petition filing date was an act to perfect a lien against property which included property of the Estate in violation

of the automatic stay.[3] EHome did not make a Motion to modify stay pursuant to 11 U.S.C. § 362(d) before recording the Mortgage, nor did it fall within any of the exceptions to the automatic stay under 11 U.S.C. § 362(b). Therefore, to the extent that the act of recording sought to perfect the Mortgage against the one-half ownership interest therein that is property of the Estate it violated the automatic stay. An action that violates the automatic stay is void. *Middle Tenn. News Co. v. Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1082 (7th Cir.2001).

### C. *Plaintiff–Trustee did not waive § 544(a)(3) lien avoidance arguments.*

▉ EHome concedes as much, but argues that because the act of perfection is void does not support Plaintiff's position that the lien itself is void. According to eHome, the proper statutory basis for avoiding the eHome Mortgage is 11 U.S.C. § 544(a)(3). *See Jones v. Salem Nat'l Bank (In re Fullop)*, 6 F.3d 422, 430 (7th Cir.1993) ("[The automatic stay] precludes a creditor from perfecting its lien ... and as a result, the trustee ordinarily could avoid the creditor's unperfected interest through its powers as a hypothetical lien creditor under § 544(a)(1)."). Nevertheless, eHome argues that Plaintiff either waived his § 544(a)(3) argument, or that it

was subrogated to the rights of AEB, whose mortgage eHome refinanced.

According to the Amended Final Pretrial Order entered in this case on June 5, 2007, "Any party not filing proposed Conclusions of Law or a brief may be found to have waived legal issues not thereby presented." In his pretrial proposed Findings and Conclusions, Plaintiff did not raise 11 U.S.C. § 544(a)(3) as a basis for avoiding the eHome Mortgage. EHome cites *Paloian*, 351 B.R. at 595–96 and *Gold*, 319 B.R. at 853–54, for the proposition that arguments not raised in a party's pretrial proposed Findings of Facts and Conclusions of Law are waived. Both of those cases are distinguishable from the case at bar in that waiver found therein was applied to arguments that were not raised at all in the pretrial pleadings, but rather raised for the first time in the party's posttrial proposed Findings of Facts and Conclusions of Law. *See Paloian*, 351 B.R. at 596; *Gold*, 319 B.R. at 854. Not so here; Plaintiff asserted § 544(a)(3) in his Amended Complaint.

The federal courts follow a notice pleading regime, *see, e.g., Erickson v. Pardus*, — U.S. ——, ——, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007), and therefore, Plaintiff was not required to plead legal theories or statutes if the Complaint otherwise gave adequate notice of the nature of

---

**3.** Recording of the eHome Mortgage sought to perfect eHome's lien not only against the Debtor's interest but also against Mrs. Berg's one-half interest in the Property, the latter interest not being protected by the automatic stay. Accordingly, eHome requests that its Mortgage against Mrs. Berg's half-interest be satisfied directly out of her portion of the proceeds from any sale held pursuant to 11 U.S.C. §§ 363(b)(1) and (h). At trial, Mrs. Berg testified that it "could" be her signature on the eHome Mortgage. (Mrs. Berg Trial Test.) In the Bergs' Post Trial Proposed Findings of Facts and Conclusions of Law ("Bergs' proposed Findings and Conclu-

sions"), Mrs. Berg also argues that she signed the Mortgage for the limited purpose of waiving the Illinois homestead exemption, and it was otherwise tampered with after she signed it. She testified to the effect that "people put papers under my nose and I signed them." (Mrs. Berg Trial Test.) Failure to read a contract is not a defense against its validity and enforceability, *Novitsky v. Am. Consulting Eng'rs, L.L.C.*, 196 F.3d 699, 702 (7th Cir. 1999), and her allegations of forgery are questionable. However, as noted below in discussion of Count X, the dispute between Mrs. Berg and eHome cannot be decided here for lack of jurisdiction.

the claims. *Hefferman v. Bass,* 467 F.3d 596, 598 (7th Cir.2006). The case at bar is analogous to *Janke Const. Co., Inc. v. Vulcan Materials Co.,* 527 F.2d 772, 776 (7th Cir.1976), where the Seventh Circuit found that the district court did not err by deciding the case on a legal theory that defendant had notice of from the pleadings but which plaintiff did not raised at the pretrial conference. According to *Janke,* "the fact that Janke misconceived the legal theory of its case does not preclude it from obtaining relief under another legal theory." *Id.*

Final pretrial orders are designed to prevent unfair surprise and give parties an opportunity to fairly prepare for and defend against new claims. *Paloian,* 351 B.R. at 596 (citing *Gorlikowski v. Tolbert,* 52 F.3d 1439, 1443–44 (7th Cir.1995)). Count III of Plaintiff's Second Amended Complaint contains a specific prayer for relief under § 544(a)(3). Because § 544(a)(3) was pleaded as a legal theory before trial in the count against eHome's loan servicer, eHome cannot claim that it was surprised by Plaintiff raising it in his post-trial proposed Findings and Conclusions.

■■■■■■ EHome argues that § 544(a)(3) was pled as a cause of action only against its loan servicer Wilshire. Plaintiff's Second Amended Complaint incorrectly describes the relationship between eHome and Wilshire as to which of the two is in fact the mortgage holder. This misapprehension was the result of Debtor incorrectly listing Wilshire as the mortgagee on his amended Schedule D. In fact, the loan secured by the Mortgage originated with eHome and was serviced by Wilshire. EHome and Wilshire were made parties to this adversary by Plaintiff's original Complaint filed on April 19, 2006, were served with summons on April 20, and filed an appearance on May 16, 2006. According to Rule 7015 Fed. R. Bankr.P., which incorporates Rule 15(c)(3) Fed.R.Civ.P.:

> An amendment of a pleading relates back to the date of the original pleading when the amendment changes the party or the naming of the party against whom a claim is asserted if ... the party brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the property party, the action would have been brought against the party.

Plaintiff cites Rule 15(b) Fed.R.Civ.P. for the proposition that "When issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Plaintiff has not moved to amend his Complaint to conform to the evidence, but "failure to so amend does not affect the result of the trial of these issues." Fed.R.Civ.P. 15(b). Thus, to determine whether a party expressly or impliedly consented to try a claim, the court must consider "whether the opposing party had a fair opportunity to defend against the claim and whether the opposing party could have presented additional evidence had they known sooner the substance of the amendment." *In re Rivinius, Inc.,* 977 F.2d 1171, 1175 (7th Cir.1992) (citations omitted).

But for Plaintiff's mistake concerning identity of the mortgagee (which, as noted, flowed from Debtor's error in completing his schedules), the claim for relief in Count III would have been brought against eHome and not Wilshire. Wilshire and eHome defended here in one trial against the same evidence involving the eHome mortgage. In its post-trial proposed Find-

ings and Conclusions, eHome responded to the merits of Plaintiff's § 544(a)(3) avoidance action. This supports the conclusion that eHome was neither surprised nor prejudiced in having to defend or respond to that issue.

By reason of the foregoing, claims under § 544(a)(3) concerning the Mortgage alleged against Wilshire in Count III can properly be deemed to have been pleaded against eHome. Therefore, it is found and held that Plaintiff's argument under § 544(a)(3) was not waived. Counts II and III against eHome and its servicer, Wilshire, both deal with the eHome Mortgage, so a single judgment will be entered on Counts II and III.

**D. *EHome did not obtain the rights of AEB through "conventional subrogation."***

**1. *Elements of conventional subrogation.***

As to the merits of Plaintiff's § 544(a)(3) theory, eHome argues that its Mortgage cannot be avoided because, by refinancing the AEB loan, it was subrogated to the rights of AEB, whose mortgage was properly recorded. While the rights given to the Trustee are governed by federal law, the extent of those rights in regard to priority of lien holders is controlled by state law. *In re Chaseley's Foods, Inc.,* 726 F.2d 303, 307 (7th Cir. 1984). Thus, one must look to Illinois law to determine whether subrogation applies in this case.

The general rule with recorded liens, including mortgages, is that "[a] lien that is [recorded] first in time ... has priority and is entitled to prior satisfaction of the property it binds." *Aames Capital Corp. v. Interstate Bank of Oak Forest,* 315 Ill.App.3d 700, 248 Ill.Dec. 565, 734 N.E.2d 493, 496 (2000) (additional citations

omitted). The doctrine of subrogation is an exception to the "first in time, first in right" rule by which a party that involuntarily pays a debt of another succeeds to the rights of the satisfied party with respect to the debt paid. *Union Planters Bank, N.A. v. FT Mortgage Co.,* 341 Ill. App.3d 921, 276 Ill.Dec. 465, 794 N.E.2d 360, 364 (2003) (citing *Aames,* 248 Ill.Dec. 565, 734 N.E.2d at 497). There are two types of subrogation: contractual or conventional subrogation, and common law or equitable subrogation. Conventional subrogation occurs when there is an express agreement between the parties to the effect that the party paying the debts on behalf of the third party will be able to assert the rights of the original creditor, and thereby be entitled to priority over an intervening lienor. *Aames,* 248 Ill.Dec. 565, 734 N.E.2d at 498. Conventional subrogation "will be applied even where the record shows a release of the satisfied incumbrance...." *Home Savs. Bank v. Bierstadt,* 168 Ill. 618, 48 N.E. 161, 162 (1897). Thus, the elements of conventional subrogation are:

> an express agreement, the lender seeking the benefit of a conventional subrogation must prove that the loan proceeds were used to refinance the mortgage for which the lender seeks to be subrogated, that no harm will come to an innocent party if priority is granted to the lender, and there has been no gross negligence.

*Union Planters Bank,* 276 Ill.Dec. 465, 794 N.E.2d at 364 (citing *Home Savs. Bank,* 48 N.E. at 162).

In this case, the eHome Mortgage included the requirement that "[b]orrower shall promptly discharge any lien which has priority over this Security Instrument [unless it takes other specified action acceptable to the lender]." (eHome Ex. 3 at ¶ 4.) Similar form language has been held

to create an express agreement for purposes of conventional subrogation. *See, e.g., Union Planters Bank,* 276 Ill.Dec. 465, 794 N.E.2d at 365. However, in opposition to the contention as to conventional subrogation, Plaintiff argues that he is an injured innocent third party and that eHome was grossly negligent for failing to record its lien for over sixteen months.

### 2. *Plaintiff is an innocent party.*

██ The cases cited by eHome can be distinguished from the facts here. In *Kaminskas v. Cepauskis,* 369 Ill. 566, 17 N.E.2d 558, 561 (1938), the mortgagor's wife claimed an inchoate dower interest superior to that of the refinancing mortgagee. The court in *Kaminskas* recognized that the equitable remedy of conventional subrogation cannot be invoked where it would injure an innocent person. *Id.* at 560. Unlike the Trustee here, appellant-wife in *Kaminskas* was not an innocent third party. The court did not expressly find that she was not an innocent third party, but found that she was never seized of dower because the property was purchased subject to the first mortgage. *Id.* at 561. Similarly, in *Kankakee Fed. Sav. & Loan Ass'n v. Arnove,* 318 Ill.App. 261, 47 N.E.2d 874, 877 (1943), the intervening mortgagees were the daughters of the mortgagor, who took the mortgage to secure legacies from their late mother's estate. In both cases, therefore, the parties claiming the intervening interest took their liens before the first mortgage was released and with the expectation that they held a junior interest.

In this case, however, Trustee as a putative bona fide purchaser cannot be found to have had knowledge of any superior lien, because the AEB Mortgage had been released. *See* Findings of Fact ¶ 61. The Trustee is not and cannot be charged with the knowledge of Debtor regarding the

eHome Mortgage. 11 U.S.C. § 544(a)(3). Therefore, he cannot be treated as one who acquired an interest as Trustee with expectation that his interest would be junior to another lien. Thus, eHome cannot step into the shoes of AEB under a theory of conventional subrogation, because to apply the doctrine to these facts would result in injury to an innocent third party.

### 3. *Gross negligence of eHome and Wilshire.*

██ In addition, failure of eHome (and Wilshire as its servicer) to record the Mortgage for more than sixteen months after it was executed was gross negligence. The Illinois Supreme Court in *Home Savs. Bank* did not expound on gross negligence in the context of conventional subrogation. *Union Planters Bank,* 276 Ill.Dec. 465, 794 N.E.2d at 365. However, under Illinois law, gross negligence is recklessness. *Resolution Trust Corp. v. Franz,* 909 F.Supp. 1128, 1140 (N.D.Ill.1995) (citing *Massa v. Dep't of Registration and Educ.,* 116 Ill.2d 376, 107 Ill.Dec. 661, 507 N.E.2d 814, 819 (1987) ("[G]ross negligence is commonly understood to encompass 'very great negligence ... [b]ut it is something less than ... willful, wanton and reckless conduct.' ")). Recklessness is "[c]onduct whereby the actor does not desire harmful consequences but nonetheless foresees the possibility and consciously takes the risk...." *Black's Law Dictionary* 1298 (8th ed.2004). Failure of eHome and its agent Wilshire to record the Mortgage for sixteen months after the mortgage was executed shows a lack of internal supervisory procedures. Somewhere along the line, someone at eHome or Wilshire dropped the ball when it came to recording the Mortgage. This was reckless conduct and, therefore, gross negligence in the business world.

#### 4. *Conclusion under § 544(a)(3)*

Consequently, eHome's claim against the property of the Estate for "conventional subrogation" is denied. The Plaintiff bankruptcy trustee as a hypothetical bona fide purchaser, did not have constructive notice of the eHome Mortgage which was not recorded for over sixteen months due to gross negligence. Therefore, that Mortgage is avoided as to property of the Estate under 11 U.S.C. § 544(a)(3).

#### E. *EHome is not entitled to a replacement lien under § 550.*

Finally, eHome argues that it is entitled to a replacement lien pursuant to 11 U.S.C. § 550(e)(1), because the satisfaction of the AEB Mortgage constituted an improvement under 11 U.S.C. § 550(e)(2)(D). *See In re Lepelley,* 233 B.R. 802, 808 (Bankr.N.D.Ohio 1999). According to 11 U.S.C. § 550(a), "Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred...." From that, eHome argues that §§ 544 and 550 must be read together and the good faith transferee defenses in §§ 550(b) and (e) are available to it, because avoidance implicitly requires recovery. Plaintiff responds that the defenses of a good faith transferee in 11 U.S.C. § 550 are unavailable to eHome, because Plaintiff has not sought to recover property under § 550 but simply to avoid eHome's Mortgage under 11 U.S.C. § 544(a)(3). The issue, therefore, is whether the § 550(e)(2)(D) defense is available when an avoidance action is not coupled with an affirmative attempt to recover property under § 550(a).

EHome relies on cases from the Fifth and Ninth Circuits, and a bankruptcy decision from the Northern District of Illinois in support of its position. In holding that recovery under 11 U.S.C. § 550 is implicit in an avoidance action, the Ninth Circuit relied on the definition of property of the estate in 11 U.S.C. § 541. *See Black & White Cattle Co. v. Granada Cattle Servs., Inc. (In re Black & White Cattle Co.),* 783 F.2d 1454, 1462 (9th Cir.1986). In *Black & White,* the debtor-in-possession argued that it did not need to recover the non-possessory interest, because that interest was already included in the bankruptcy estate which consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.*; 11 U.S.C. § 541(a)(1). In a single sentence, the opinion held without further explanation that "[s]ince only the *interests* retained by B & W automatically became part of its estate, B & W necessarily had to 'recover' any other interest in the property that had been transferred to Granada." *Black & White,* 783 F.2d at 1462.

The Fifth Circuit's reasoning is equally unpersuasive. *See Weaver v. Aquila Energy Mktg. Corp. (In re Trans Mktg. Houston, Inc.),* 196 B.R. 945 (S.D.Tex. 1996), *aff'd,* No. 96–20592, 1997 WL 336190 (5th Cir. May 30, 1997). The issue in *Weaver* was not whether the § 550 good faith transferee defenses were available in an avoidance action, but whether, in addition to the requirements of 11 U.S.C. § 547(b), the Chapter 11 liquidating trustee had to show a benefit to the estate in order to avoid a preferential transfer. *See Weaver,* 196 B.R. at 954–55. Under the pre–1978 Bankruptcy Act, avoidance actions could only be maintained if the avoidance benefitted the estate. *Id.* at 955. The district court opinion went outside the four corners of the statute to read this requirement back into the Code, because "[h]ere, the language of §§ 547(b) and 550(a) are at odds with bankruptcy law's longstanding principal to refuse to allow a

debtor to avoid a lien where only the debtor, not the general creditors, benefit." *Id.* at 954. The Fifth Circuit cited approvingly "the district court's thoughtful explanation of why the 'benefit of the estate' test must still be met ..." but went on to "conclude that here such statutory construction dispute is entirely academic...." *Weaver,* 1997 WL 336190, at *6. The district court cites several maxims of statutory construction in support of its reasoning, *Weaver,* 196 B.R. at 954, but the court's conclusion highlights the pitfalls of relying on legislative history to surmise the legislature's intent insofar as the analysis ignores other applicable Code provisions and supporting legislative history.

The foregoing two cases cited by eHome lack a persuasive analysis of the Bankruptcy Code. Their reasoning cherry-picks sections of the Code and its legislative history, relying on maxims of statutory construction to find inconsistencies in the drafting where there are none in order purportedly to implement the general policy behind bankruptcy.

 The discussion in Suhar, the Sixth Circuit case cited by Plaintiff, is directly on point and contains the most persuasive analysis of the issue. *Suhar v. Burns (In re Burns),* 322 F.3d 421, 425–29 (6th Cir. 2003). There are four Code provisions that are relevant to the *Suhar* analysis. *See id.* at 426. The analysis begins with § 544(a)(3). In this case, Plaintiff, as a hypothetical bona fide purchaser, properly avoided the eHome Mortgage for being improperly recorded. See discussion in Subsection D above. However, "avoidance and recovery are distinct concepts and processes." *Id.* at 427. *See also Weaver,* 196 B.R. at 954–55. First, avoidance and recovery are covered by two different sections of the code, and have two different statutes of limitation. *See* 11 U.S.C. §§ 544, 546, 550. In addition, this distinc-

tion is supported by the legislative history. According to the Historical and Statutory Notes that accompany 11 U.S.C. § 550, "Section 550 prescribes the liability of a transferee of an avoided transfer, *and enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee.*" (Emphasis added). Avoidance is a necessary precondition for recovery, but is not a sufficient condition for recovery. *Suhar,* 322 F.3d at 427. Rather, "[t]he trustee's remedy of recovery is necessary only when the remedy of avoidance is inadequate." *Id.*

The remedy of avoidance is adequate for a non-possessory mortgage interest by operation of 11 U.S.C. § 551. According to § 551, "Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate." According to the Historical and Statutory Notes that accompany § 551, "The operation of this section is automatic, unlike current law, even though preservation may not benefit the estate in every instance." The language of § 551 and its legislative history establish that, contrary to the conclusion reached in *Weaver,* this is not one of those "rare cases in which a literal application would lead to a result demonstrably at odds with the drafter's intentions." 196 B.R. at 954. Rather, Congress showed in the statutory text an intent that an avoided non-possessory lien would automatically be preserved pursuant to § 551 regardless of any benefit to the estate.

Finally, 11 U.S.C. § 550(a) is not necessary to bring an avoided transfer within the property of the estate, because "[a]ny interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title" is part of the bankruptcy estate pursuant to

11 U.S.C. § 541(a)(4). *Suhar*, 322 F.3d at 428. *Black & White* was correct insofar as § 541 provides for the avoided interest to become property of the Estate. However the avoided interest automatically becomes property of the Estate by virtue of § 541(a)(4), and not as the result of recovery under § 550(a).

The Sixth Circuit opinion in *Suhar* recognized that treating avoidance and recovery separately favors possessory transferees over non-possessory transferees, *id.* at 428–29, and, therefore, may encourage transferees to race to foreclose their liens in order to get the benefit of good faith transferee defenses in 11 U.S.C. § 550. That result would be in conflict with the general goal of the Code, which is to discourage creditors from racing to disassemble a debtor's assets and otherwise encourage the orderly administration of the bankruptcy estate. However, *Suhar* reasoned that the distinction between avoidance and recovery does further another important bankruptcy goal, which is to increase the assets available to general unsecured creditors by denying the § 550 defenses to a non-possessory transferee. So in this case, no defense of improvement can be asserted under § 550(e)(2)(D).

### Conclusion as to Counts II and III

For the foregoing reasons, eHome was not subrogated to the rights of AEB under its properly recorded Mortgage, because eHome was grossly negligent in failing to record its Mortgage for sixteen months and subrogation would harm an innocent third party, in this case the Trustee. In addition, it is found and held that the good faith transferee defenses in 11 U.S.C. § 550 are not available to a creditor when avoidance is sufficient to preserve the avoided interest, and affirmative recovery is unnecessary to recover the interest. Thus, eHome did not obtain and is not

entitled to a replacement lien on the property of the Estate under § 550(e).

Therefore, a single judgment will be entered on Counts II and III in favor of Plaintiff–Trustee, avoiding the eHome Mortgage as to the Estate's one-half interest, and declaring that Wilshire never held any ownership or lien interest.

### Count VIII: Debtor's Discharge Will Be Denied

In Count VIII, Plaintiff objects to Debtor's discharge pursuant to 11 U.S.C. § 727(a). Debtor defends, after trial, that these claims were not sufficiently pled or, in the alternative, were waived, or that the Trustee has not otherwise carried his burden of proof regarding his objections to discharge. In his Second Amended Complaint, Plaintiff pleads several theories for denying discharge under alternative provisions of § 727(a), but those alternative arguments need not all be addressed if the case can be disposed of on any one of those theories. *See Adamszewski v. Local Lodge 1487 et al.*, 496 F.2d 777, 786 (7th Cir.1974) ("But we need not decide that point since another ground exists for dismissing this action under any theory. . . ."). Therefore, this discussion will be limited to §§ 727(a)(2) and (3), which are the only parts of § 727 that Plaintiff argues in his post-trial proposed Findings and Conclusions.

Debtor argues that Plaintiff waived his arguments under § 727(a)(2), because they were not contained in his Second Amended Complaint. For reasons stated above in the discussion of Counts II and III, this argument is without merit. The federal courts follow a notice pleading regime, *see, e.g., Erickson*, 127 S.Ct. at 2200, and therefore, Plaintiff was not required to plead legal theories or statutory provisions unless needed to give notice of what the claim is. *Hefferman*, 467 F.3d at 598. Moreover, Plaintiff raised § 727(a)(2)

as a basis for relief in his pretrial proposed Findings and Conclusions in compliance with the Final Pretrial Order. Thus, Debtor cannot argue that he was surprised or unfairly prejudiced by Plaintiff's arguments, and it is found and held that those arguments were not waived.

In order to deny Debtor's discharge pursuant to § 727(a)(2), the Trustee must prove: (1) that Debtor transferred property; (2) within one year of filing bankruptcy; (3) with actual intent to hinder, delay or defraud his creditors. *See In re Kablaoui*, 196 B.R. 705, 708–10 (Bankr.S.D.N.Y.1996). Actual intent may be established by circumstantial evidence or inferred from Debtor's conduct, including the so-called "badges of fraud." *Id.* at 709–10 (citing *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582–83 (2d Cir. 1983)). Because of the policy behind bankruptcy of providing the debtor with a fresh start, Plaintiff has the burden of proving every element of his objection to discharge by a preponderance of evidence. *In re Scott*, 172 F.3d 959, 966–67 (7th Cir.1999).

On April 3, 2005, Debtor executed a quitclaim deed transferring the Property to the Rothmann/Tucker Trust. Debtor's bankruptcy petition was filed on October 15, 2005. Thus, Plaintiff has established the first two elements, that there was a transfer of property within one year of the bankruptcy. As discussed above, moreover, this is the rare case where Debtor admits that it was his actual intent to hinder, delay, or defraud his creditors. According to Debtor, he had a conversation with Tucker in early 2005 about how to stave off his creditors. (Debtor Trial Test.) He testified further that when Tucker came to the Bergs' house on April 3, he believed that Tucker was acting as his attorney, and that signing the Quitclaim Deed was a way to protect assets and in

his best interest. *See* Findings of Fact ¶ 73.

Debtor defends on the basis that he was acting on the advice of counsel and attempted to rescind the transfer. Those arguments are without merit. First, a debtor's reliance on the advice of counsel must be in good faith, and there is no good faith where the debtor knew that the purpose of the transfer was to hinder, delay or defraud his creditors. *See In re Snell*, 240 B.R. 728, 730–31 (Bankr. S.D.Ohio 1999). In this case, Debtor admitted that he thought the purpose of the transfer was to protect his assets from creditors, (Debtor Trial Test.), and therefore, his reliance was not in good faith. Second, the pre-petition undoing of an earlier fraudulent transfer does not necessarily absolve the debtor of his original wrongful intent. *Village of San Jose v. McWilliams*, 284 F.3d 785, 792 (7th Cir. 2002). Section 727(a)(2) is intended to provide the incentive necessary to discourage fraudulent transfers, and debtors should not be rewarded for attempting to undo improper transactions. *Id.* Indeed, the only reason Debtor attempted to rescind the Quitclaim Deed was because Mrs. Berg, who refused to sign, sought separate legal advice and reported the advice she received (as to the possible consequences) to her husband. For the foregoing reasons, it is found and held that Debtor transferred property within one year of his bankruptcy with the actual intent to hinder, delay or defraud his creditors. Therefore, his discharge will be denied under § 727(a)(2).

Pursuant to 11 U.S.C. § 727(a)(3), a debtor's discharge may also be denied if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any record information, including books, documents, records, and papers, from which the debtor's financial

condition or business transactions might be ascertained." Section 727(a)(3) requires the debtor to produce records which provide creditors or a chapter 7 trustee "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Matter of Juzwiak,* 89 F.3d 424, 427 (7th Cir.1996) (quoting *In re Martin,* 141 B.R. 986, 995 (Bankr.N.D.Ill.1992)). A debtor's records do not have to be perfect, but "courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs." *Id.* at 428.

Debtor responds that the Trustee did not establish the specific documents that he contends were concealed, destroyed or not preserved, or what effect this had on administration of the Estate. Debtor does not cite any authority that these arguments are proper defenses to § 727(a)(3), and they are found to be without merit. In this case, Debtor, who was an active businessman and personal investor, did not produce any records at all. At trial, he testified that after Berg Manufacturing executed the Assignment for Benefit of Creditors he was unable to return to the business office to obtain his records. (Debtor Trial Test.) However, he took no steps to employ judicial process to recover them. (*Id.*) In addition, he testified that he did not retain personal statements from American Enterprise Bank or Merrill Lynch. (*Id.*) Without receipt of any records with which to ascertain Debtor's financial condition, Trustee cannot be asked to explain the effect this had on administration of the Estate. A chapter 7 trustee does not have the burden to explain why he needed or how he could have used documents that he never received. This is not an element necessary to prove an ob-jection to discharge under § 727(a)(3) and, under circumstances of this case, it is clear why there is no rationale for such a requirement. It can hardly be argued that a sophisticated business debtor who produces no records at all can defeat a § 727(a)(3) action to bar discharge because neither Plaintiff nor the court can know what records were not produced. It is found and held that Debtor failed to preserve records from which to ascertain his financial condition as required by § 727(a)(3) and, therefore, his discharge will be denied.

For the foregoing reasons, judgment on Count VIII will be entered in favor of Plaintiff–Trustee, and Debtor's discharge will be denied under both §§ 727(a)(2) and 727(a)(3).

### Count IX: Tucker will be Ordered to Turnover Possession of the Property

 Tucker currently resides at the Property. In Count IX, Plaintiff seeks, pursuant to 11 U.S.C. § 542(a), to compel Tucker to turnover physical possession of the Property to the Trustee. According to § 542(a):

> Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease, under section 363 of this title, or that the debt-or may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

"In effect, § 542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings." *Whiting Pools, Inc.,* 462

U.S. at 207, 103 S.Ct. 2309. In order to compel turnover, Plaintiff must establish that the Property is property of the Estate pursuant to 11 U.S.C. § 541(a)(1) as interpreted by the Supreme Court in *Whiting Pools, Inc. See Century Hotels v. U.S.*, 952 F.2d at 112–13. Section 542(a) is a rights and liabilities provision, not a substantive recovery provision. Having found that Tucker does not have any equitable interest in the Property, he is required to turn it over to the Trustee. While Mrs. Berg retains an undivided one-half interest in the Property, she does not occupy or use it and turnover of physical possession to the Trustee will not affect her. Moreover, the Trustee will be allowed to sell the Property under judgment to be entered in Count X (with one-half the net proceeds to be held for Mrs. Berg and claimants against her interest), and therefore he will require possession of the whole Property.

Judgment on Count IX will therefore be entered in favor of Plaintiff–Trustee requiring Tucker to turn possession of the Property over to the Trustee within ten days after Judgment is entered, or later if Plaintiff agrees to further possession date.

### Count X: Trustee Will Be Authorized to Sell the Property

Plaintiff seeks to sell the Property and use the proceeds for the benefit of the bankruptcy Estate. Pursuant to 11 U.S.C. § 363(b), "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 363(h) further provides that, "Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety . . . ." Mrs. Berg admits in her pleading all the allegations contained in Count X and, has not opposed the requested sale. Therefore, the Trustee will be allowed to sell the Property pursuant to the provisions of § 363.

Pursuant to 11 U.S.C. § 363(j), the trustee is to distribute to the spouse or co-owner the appropriate portion of the proceeds of sale, less certain administrative expenses. In its post-trial proposed Findings and Conclusions, eHome requests that the Trustee be directed to distribute the proceeds of Mrs. Berg's one-half interest to be applied directly against its mortgage lien. At trial, Mrs. Berg attacked the validity of the eHome Mortgage, contending that she signed it for the limited purpose of waiving her homestead right and that it was otherwise tampered with. While those claims seem dubious, it is concluded that the bankruptcy court does not have subject matter jurisdiction over any dispute between Mrs. Berg and eHome or any other non-debtor party concerning proceeds of the sale of her interest.

According to 28 U.S.C. § 1334(b), "[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Pursuant to 28 U.S.C. § 157(a), the district courts may refer cases arising under Title 11 to the bankruptcy court for their district. The validity of the eHome Mortgage and other claims against Mrs. Berg are disputes between non-debtors under non-bankruptcy law. Thus, it does not come within the bankruptcy court's "arising under" jurisdiction. Although Debtor's one-half interest in the Property is property of the Estate, the dispute between Mrs. Berg and eHome and other Defendants over Mrs. Berg's one-half interest does not fall under the bankruptcy court's "related to jurisdiction" because the results of those controversies will not

affect the bankruptcy Estate. A bankruptcy court has no jurisdiction over a controversy between non-debtor parties concerning property that the estate does not claim unless the outcome of that dispute would affect administration of the estate. *Churchill Cabinet Co. v. Cont'l Illinois Nat'l Bank and Trust Co. of Chicago (In re Destron, Inc.)*, 38 B.R. 310, 312–13 (Bankr.N.D.Ill.1984). *See also In re Burton Coal Co.*, 126 F.2d 447 (7th Cir.1942). It has been determined here that Debtor held a one-half interest in the Property which became property of the Estate, and Mrs. Berg owns the other one-half interest. Whatever happens to her interest and any claims against it has no effect at all on distribution from the Estate. Therefore, the bankruptcy court lacks either core or related subject matter jurisdiction over any claims asserted against her interest.

For the foregoing reasons, judgment on Count X will be entered in favor of Plaintiff–Trustee, and he will be permitted to sell the Property pursuant to 11 U.S.C. §§ 363(b) and (h). The lien claims of various defendants against Mrs. Berg's share of net proceeds will attach to her one-half of the net proceeds, but those claims will not be decided in this Court. Her share of net proceeds will be deposited in hands of some neutral custodian or escrowee on contractual terms that may be enforced by a nonbankruptcy court with jurisdiction to determine the various claims against her interest in the Property.

### OTHER ISSUES

The parties raise a number of other issues which need not be decided here or cannot be decided here because the bankruptcy court lacks subject matter jurisdiction. In addition to claims between eHome and Mrs. Berg discussed in Count X, Tucker has an as yet unresolved claim against Mrs. Berg for attorneys fees. Parties claiming interest against the Property and therefore against Mrs. Berg's half interest therein have not had their claims against her interest adjudicated herein. For reasons stated in the discussion of Count X, the bankruptcy court does not have subject matter jurisdiction over issues between Mrs. Berg and other non-debtors. Those issues do not arise under or relate to the bankruptcy proceeding, and do not affect administration of the Estate. Thus, while this opinion has decided claims that affect the Trustee's one-half interest in the Property as property of the Estate, it reaches no conclusion and will enter no judgment as to claims between the Defendants themselves.

### CONCLUSION

For the foregoing reasons, the Trustee's counsel will be ordered to supply one Final Judgment Order as to all ten counts with one part adjudging Counts II and III in a single judgment, and remaining parts separately adjudging each of the remaining eight counts, all in accord with the foregoing Conclusions.